**GENERAL HOST CORPORATION,**
Plaintiff,

v.

**TRIUMPH AMERICAN, INC., et al.,**
Defendants.

**No. 73 Civ. 1144.**

United States District Court,
S. D. New York.

April 2, 1973.

As Amended April 11, 1973.

750

Edwin E. McAmis, Daniel J. Sullivan, Martin S. Kaufman, Lovejoy, Wasson, Lundgren & Ashton, New York City, Robert W. Sweet, Barry H. Garfinkel, Henry P. Wasserstein, Thomas J. Schwarz, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff.

Donald I. Strauber, Yvette Harmon, Chadbourne, Parke, Whiteside & Wolff, New York City, for defendants Triumph American, Inc., Triumph Investment Trust, Ltd., G. Thomas Whyte, Leonard J. Richenberg, Philip B. Saul, Alan R. Gruber, Emmanuel Perdikis, and Justin Karp.

Peter Fleming, John Sprizzo, Peter Leisure, Robert Lipton, Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant Lloyds & Bolsa International Bank, Ltd.

John R. Hupper, Robert Rosenman, Andrew Tashman, Cravath, Swaine & Moore, New York City, for defendants A. Robert Towbin, C. E. Unterberg Towbin Co. and Abraham & Co., Inc.

OPINION

PIERCE, District Judge.

In an action filed in this Court on March 19, 1973, General Host Corp. (hereinafter Host) alleged various violations of federal law in connection with a cash tender offer for Host common stocks announced on March 16, 1973 by Triumph American, Inc. (hereinafter Triumph). By order to show cause dated March 19, 1973, Host sought a preliminary injunction restraining Triumph from further solicitation of Host shares, and from consummating the tender offer, and from voting or utilizing in any way Host shares previously acquired by Triumph.

For the reasons set forth below, this Court has determined that Host has met its burden of showing probable success on the merits of at least two of the alleged violations of Section 14(e) of the Securities Exchange Act of 1934 (15 U.S. C. § 78n(e)). The Court further finds that the balance of the equities favors Host; and enjoins Triumph from consummating the tender offer pending final determination of the issues at trial.

*The factual background*

The plaintiff Host is a New York corporation whose stock is listed on the New York Stock Exchange and is registered pursuant to Section 12 of the Securities Exchange Act of 1934 (15 U.S. C. § 78l). Through its various divisions and subsidiaries Host manufactures and sells baked goods, convenience foods, and owns and operates convenience food stores, inns, lodges, vessels, restaurants and recreational facilities in two national parks. Host's sales for the year ending December 31, 1972, totalled $555,484,000; its total assets exceed $213,000,000, including about $35,000,-000 in cash and marketable securities.

Defendant Triumph is a Delaware corporation organized in November of 1970. In December of 1970 it acquired 95% of the outstanding common stock of Resolute Insurance Company (hereinafter Resolute), its major asset. Triumph's revenues for the year ending March 31, 1972, were $25,795,905; its total assets at that time were $39,455,625.[1]

1. This figure, from Triumph's 1972 Annual Report (Plaintiff's Exh. I-L) is a consolidated figure, including Triumph's subsidiaries (chiefly Resolute). An uncon-

Eighty-two percent of Triumph's outstanding common stock is owned by defendant Triumph Investment Trust Ltd. (hereinafter Triumph Investment), an English corporation principally engaged in merchant banking, insurance underwriting, investments and securities, international metal trading and real estate investment.

■ On March 14, 1973, Triumph borrowed $20,000,000 from defendant Lloyds-Bolsa International Bank, Ltd. (hereinafter Lloyds-Bolsa), an English corporation, for the purpose of financing a tender offer for Host shares; and on March 14, 1973, Triumph Investment, having received permission from the United Kingdom Treasury, guaranteed the loan. On March 15, 1973, Triumph filed with the Securities and Exchange Commission (hereinafter SEC) a Schedule 13D with respect to its proposal to purchase 1,075,000 shares of Host common stock at $18.50 per share. The public announcement of the cash tender offer was made the following day, March 16, 1973, in several publications including *The New York Times* and *The Wall Street Journal*. The offer stated that it would expire at 5 p. m., March 30, 1973, with Triumph reserving the option to extend it from time to time. Triumph reserved the right to purchase less than 1,075,000 shares, if less were tendered, and the right to purchase more, if more were tendered. Coupled with its prior holdings of Host stock,[2] acquisition of the 1,075,000 shares would give Triumph fifty-one percent of Host's outstanding common stock. Triumph stated in its tender offer that its intention was to gain control of Host.

As noted above, Host then filed this action against Triumph's tender offer on the following Monday, March 19, 1973. This Court granted Host's motion for accelerated discovery and scheduled a hearing on the motion for a preliminary injunction to commence Friday, March 23, 1973.[3] The Court continued to hear

solidated figure for Triumph alone, for a comparable period, is not reported. But counsel for General Host has repeatedly represented that the current unconsolidated assets for Triumph alone are approximately $15,000,000. See Transcript, pp. 9, 61, 128–129. This representation was not controverted and is supported by very similar figures for the year ending December 31, 1971, set forth in Plaintiff's Exh. I-K, p. 34 (consolidated assets: $39,203,965) and p. 37 (unconsolidated assets: $15,584,476).

2. Triumph's tender offer states that Triumph is the beneficial owner of 12,600 shares of Host (approx. 0.6% of the presently outstanding Host common stock.) These shares were purchased in the open market between February 9, 1973, and February 23, 1973. Plaintiff's Exh. I-A, p. 4, ¶ 8. One of the allegations in Host's complaint in this action is that these shares, plus an earlier acquisition of Host shares, by two Triumph officers of 4,400 and 800, respectively, from September 1971 to December 1972, indicate an earlier intent to attempt to take over Host. Host's position seems to be that Triumph, therefore, should have filed a 13D statement at a point earlier in time. Triumph's prior holdings are nowhere near the percentage requirements of the regulations under 15 U.S.C. § 78n(d), and Host's argument would seem to be without merit. See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 356 F.Supp. 1066, 1073 (S.D.N.Y., 1973).

3. On March 20, 1973, Triumph filed a separate action charging Host with violations of Section 14(e) in connection with the Host public response to the Triumph tender offer. On the same date, this Court signed an order directing Host to appear on March 23, 1973, to show cause why a preliminary injunction should not issue restraining Host from communicating with Host shareholders in violation of Section 14(e). The Court declined to sign a temporary restraining order, but did grant Triumph's motion for accelerated discovery.

The combined hearing on both motions for preliminary injunctions was commenced at 9:15 a. m., Friday, March 23, 1973, at which time Triumph withdrew its motion, stating that a Host letter to shareholders dated March 22, 1973, had satisfactorily set forth the earlier alleged omitted facts. Thus, the only matter before the Court at the hearing was Host's motion for a preliminary injunction in connection with Triumph's tender offer.

testimony and receive evidence on Saturday, March 24 and Monday, March 26 and Tuesday, March 27. The hearing was thereafter adjourned and continued from day to day at the parties' request, while settlement discussions took place. On Thursday, March 29, 1973, the day before the tender offer period was due to expire unless extended by Triumph, the Court was informed that resolution of the issues could not be reached by the parties. The Court, then for the first time, took the matter under advisement. At the Court's instance, counsel for defendants represented that consummation of the tender offer would not occur pending entry of a decision by the Court before 11 a. m. the following Monday, April 2, 1973.

*The issues*

Host's allegations regarding Triumph's tender offer can be divided into three categories:

1) Claimed violations of the federal shipping and communications laws.

Among Host's holdings are two wholly owned subsidiaries, Yellowstone Park Co. and Everglades Park Co., Inc., which operate concessions in the named parks pursuant to U.S. Department of Interior contracts. Among the assets owned by Everglades are two tourist vessels, the Bald Eagle and the Pelican, which ply the waters of that park. Host asserts that the transfer of fifty-one percent of its outstanding common stock to a foreign controlled company such as Triumph, without prior permission of the U.S. Secretary of Commerce, will result in.violations of the Shipping Act, 46 U.S.C. §§ 808 and 835, and could lead to forfeiture of the boats and forfeiture of Triumph's acquired interest in Host to the U.S. Government.

Similarly, Host asserts that the transfer of fifty-one percent of its shares may result in revocation by the Federal Communications Commission of the licenses for its radio stations which are used in both parks for communications from ship to shore, and in Yellowstone, from snow coaches to base. Host cites the Communications Act (47 U.S.C. § 310) which states that any transfer of an FCC license must be first approved by that Commission.

Host claims that loss of the two vessels and the radio licenses would result in substantial impairment of these park operations and cause uncertainty among Host shareholders as to the viability of these two subsidiaries. The gross sales of these two companies combined represented about two percent of Host's total gross revenue in 1972.

2) Claimed violation of the margin requirements of securities law.

Host asserts that Triumph Investment's guarantee of the $20,000,000 loan to Triumph from Lloyds-Bolsa to finance the tender offer is an indirect extension of credit which far exceeds the maximum allowed by Section 7 of the Securities Exchange Act of 1934 (15 U.S.C. § 78g), thereby subjecting Host and its shareholders to participation in an illegal transaction which is contrary to the intent of Congress and the public interest.

3) Claimed violations of the disclosure requirements of securities law.

Finally, Host asserts several misrepresentations and omissions of material fact in Triumph's tender offer which, it is alleged, violate Section 14(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(e)):

a) Failure to disclose the possibility that the tender offer violates the Shipping Act, the Communications Act, and the margin requirements of the Securities Exchange Act of 1934; and failure to disclose the possible consequences of such violations.

b) Failure to disclose Triumph's alleged Investment Company status, or potential Investment Company status, and the fact that Triumph has not registered as an Investment Company pursuant to 15 U.S.C. §§ 80a–1 to 80a–52; and failure to disclose the possible consequences of such violation.

c) Failure to disclose foreign government controls.

d) Failure to disclose intentions with regard to Host's liquid assets.

e) Failure to disclose the adverse consequences under Office of Foreign Direct Investment rules if, through Triumph's acquisition of Triumph Insurance Company, an English corporation, Host becomes a direct foreign investor and is forced to repatriate approximately $28,000,000 in liquid assets currently invested abroad, where it obtains a higher return.

f) Failure to disclose that there is a group behind the tender offer, consisting of Triumph, Triumph Investment, possibly Lloyds-Bolsa, and others unknown; and failure to file a Schedule 13D as a group.

### The preliminary injunction

■ At this juncture in this action, this Court is required only to decide if the plaintiff Host has carried its burden of demonstrating either a combination of probable success on the merits and the possibility of irreparable injury, *or* that it has raised serious questions going to the merits and that the balance of hardship is tipped sharply in its favor. See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687, at 692, 2 Cir., March 12, 1973, quoting Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2 Cir. 1972).

Given the time-frame in which this controversy has arisen and must be decided, the Court has proceeded on the premise that relief should issue if Host has borne its burden on at least one of the issues raised. This Court, at this time, has selected for determination of probability of success on the merits two of the issues which commend themselves for immediate consideration, leaving for trial those issues which, however substantial, are not critical to the determination of this motion.

Thus, in the main this opinion will address the alleged violations of Section 14(e), and more specifically, the allegations of failure to disclose the matters relating to Triumph's plans for Host's liquid assets, and the matter of foreign control. The Court will first turn to the consideration of the substantiality of these alleged violations of the securities law, and the probability of Host's success on the merits of such claims at a trial. Thereafter, the Court will consider the balance of equities as between the parties.

### The probability of success on the merits

Section 14(e) of the Securities Exchange Act of 1934 has been held to track the language of Rule 10b–5, 17 C. F.R. § 240.10b–5 (1972), the difference being that the relatively new Section 14(e) applies to tender offers and 10b–5 applies to the purchase or sale of securities. Therefore, with respect to each of the two alleged violations of Section 14(e) which the Court has selected as dispositive of the motion before it, the determinative question at a trial on the merits is: Was the omission or misrepresentation of fact material?

■ The test for materiality requires that Host must establish that the facts omitted or misrepresented were material facts in the sense that a reasonable "prototype" investor might have considered them important in the making of his decision to tender or not to tender in response to Triumph's tender offer. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); See Chris-Craft Industries v. Piper Aircraft Corp., 480 F.2d 341, at 362 (Timbers, J.) and 399–400 (Mansfield, J., concurring); Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., *supra*, 476 F.2d at 696.

a) Failure to disclose intentions with regard to Host's liquid assets.

Host contends that Triumph failed to meet the requirements of Section 14(e) by not disclosing in its tender offer published March 16, 1973, its intention

to convert certain of Host's assets into cash. Host offers the following evidence in support of its contention as to Triumph's intentions.

On February 28, 1973, G. Thomas Whyte, Chairman of the Board of Triumph and Chief Executive officer of Triumph Investment, wrote to Philip Saul, Vice President of Triumph and Assistant Managing Director of Triumph Investment, stating:

> . . . The subsidiary companies of General Host could (depending on results of future studies and analyses) each be converted into cash. Further information is being made available to Alan [Alan Gruber is President of Triumph] in the next few days but present indications from our informants confirm that if everything was sold, the net equity would come out at over $20 per GH share and the total cash that would be available would amount to $150 million.

Plaintiff's Exh. I–KK, p. 5.

On March 8, 1973, Stephen H. Crane, Assistant to the President of Triumph, sent to Whyte a written communication in which he stated:

> . . . More important to Triumph American would be the growth potential inherent in GH's large capital resources and borrowing power, as well as the possibility of making further acquisitions with presently held cash. Also, future plans might include decisions to cause GH to sell assets not deemed essential to efficient operations, and proceeds therefrom could be used to augment the cash resources available for acquisitions.
>
> .    .    .    .    .    .
> .    .    .    .    .    .
>
> Triumph American would intend to finance the proposed tender offer with a two-year bank loan of dollars 20 million, to be guaranteed by Triumph Investment Trust, and

would plan to repay the loan through one of the following possibilities or a combination thereof:

> 1. A public offering of stock by Triumph American for a major portion of the amount of the loan
>
> 2. *A merger of Triumph American into GH, and repayment of the loan with the latter's financial resources*
>
> 3. The refinancing of part or all of the debt with institutional lenders. . . .

Plaintiff's Exh. I–MM, pp. 3–5; See also Plaintiff's Exh. I–OO, pp. 3–4. (Emphasis added)

In a communication dated March 12, 1973, from Whyte to Alan Gruber, President of Triumph, which apparently pertains to Triumph's interest in Host, the following is stated: ". . . [T]he attraction of the transaction lies in the use of approximately $100 million of gearing that comes with the company." Plaintiff's Exh. I–NN, p. 3.

Clearly a tender offeror is not required to share with prospective tenderers every matter that was discussed or considered in anticipation of making its offer. Any number of strategic fiscal and investment possibilities and combinations necessarily must be considered in undertakings such as these where the aim is to achieve control of a major target company. Thus, there is nothing unusual about the fact that these exchanges occurred and ordinarily there would be no need to consider divulging them to shareholders.[4]

However, there are important additional facts here which must be considered in assessing Host's assertions that Triumph violated Section 14(e) by its failure to disclose to Host shareholders in its tender offer that Triumph was in all likelihood planning the conversion of certain of Host assets into cash.

The evidence shows that Triumph was organized under the laws of Delaware in

---

4. In fact it could be as serious an infringement of Section 14(e) to overstate the definiteness of plans as to understate them. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2 Cir. 1969).

1970 and has been engaged primarily in the insurance business through its subsidiary, Resolute. Resolute was acquired on December 29, 1970, by Triumph for cash at a cost of approximately $14,033,000. Most of the cash used in making acquisition was borrowed from Lloyds & Bolsa and from Triumph Investment. In its prospectus dated April 28, 1972, offering 125,000 shares of common stock, Triumph stated:

> *Dividends*: Resolute paid no cash dividends prior to its acquisition by the Company [Triumph] in December, 1970. In 1971 a dividend of $2,098,252 [5] was paid by Resolute to the Company, which dividend was used to repay in part a loan incurred in financing the acquisition. . . .
> In February 1972 Resolute paid the Company a $1,600,000 dividend.

Plaintiff's Exh. I–K, pp. 9–10.

Host asserts, and it is not controverted by Triumph, that less than thirty days after Triumph acquired Resolute, its nominees were elected to Resolute's Board of Directors, and four days later Resolute's Board, which had never declared a cash dividend previously, voted a $3,000,000 cash dividend.

Host contends that in the instant case, predicated upon this course of conduct undertaken by Triumph once it took over Resolute, and upon the statements of Triumph's officers and directors, *supra,* it is clearly reasonable to conclude that it is Triumph's intention, if it gains control of Host, a cash-rich company,[6] to convert certain of Host's assets in order to repay the cost of acquiring Host shares—in other words, that Host is to be purchased, in effect, by Triumph using Host's own cash. Host contends that this is a material fact which pursuant to Section 14(e) should have been disclosed to Host shareholders.

This Court agrees. The sole major transaction of Triumph from the time it was organized in 1970 until the present time has been its acquisition of Resolute, and, thus, Triumph's history of dealings with Resolute must be considered in conjunction with the pre-tender offer dialogue which occurred among Triumph officers and directors. As noted above, this history includes Triumph causing Resolute (with equity of $14,822,000)[7] to declare a $3,000,000 dividend within one month after Triumph took over Resolute.

The Court finds that Triumph failed to meet its burden of fully, frankly and honestly revealing in its tender offer sufficient information from which prospective tenderers might draw their own conclusions regarding the likelihood of Triumph converting Host assets into cash. In short, had the prototype shareholder known that Triumph was seriously discussing the conversion into cash of certain Host assets, coupled with the knowledge of what Triumph had done in this regard in its sole prior acquisition, he might well have not tendered his shares.

Triumph has argued that even should it be successful in acquiring fifty-one percent of Host shares it still would not have "control" of Host due to the difficulties presented by Host's by-laws which have apparently been adopted in order to be highly protective of Host's

---

5. The original 1971 dividend figure was $3,000,000 which was paid to Triumph. But by agreement with the Insurance Commissioner of Connecticut, acting under authority of the Connecticut insurance law which regulates the payment of dividends, $901,748 of this dividend was repaid in October, 1971. Plaintiff's Exh. I–K, p. 40, note.

6. Following an unsuccessful cash tender offer to gain control of Armour & Co., in late 1968, Host negotiated the sale of its 54% of Armour for cash, notes, warrants, and convertible preferred shares valued at $211,000,000, and later converted this package to cash. Since then it has made several investments utilizing these liquid funds, but it still has approximately $35,000,000 in cash and marketable securities. See Plaintiff's Exh. I-BBB, p. 4.

7. Plaintiff's Exh. I-K, p. 3.

present structure and management.[8] The difficulties posed by Host's by-laws in this respect notwithstanding, Triumph *"is offering to purchase General Host common stock with a view to control of General Host."* Plaintiff's Exh. I–A, p. 4 (Emphasis added). Further, Triumph fully expected, upon advice of counsel, that these "defenses against a take-over bid . . . will not prove effective to the management of General Host if Triumph American obtains 51% of General Host." Plaintiff's Exh. I–BBB.

The Court notes that Triumph's tender offer states that it has borrowed $20,000,000, on an unsecured basis, at high interest rates, in order to make the offer and that the loan is repayable in approximately two years. Since Triumph reports assets of only $15,000,000,[9] further credence is lent to Host's contention that Triumph, if successful in its take-over bid, plans to convert Host assets into cash, just as it did when it took over Resolute, and will use this cash to repay the loan.

Triumph did see fit to state in its prospectus of April 28, 1972, the fact that after Triumph acquired Resolute it declared its first cash dividend and paid Triumph over $2,000,000 in dividends which was used to repay in part a loan incurred in financing the acquisition. Plaintiff's Exh. I–K, p. 9. While this disclosure was no doubt intended to make Triumph's stock offering attractive to prospective purchasers, it also revealed material facts concerning Triumph's history. These facts, under the circumstances of the instant case, were no less material and should have been disclosed in Triumph's tender offer for Host shares, thereby enabling Host shareholders to determine with knowledge of this history whether they wished to tender their shares.

The Court is aware that Triumph states in its tender offer that it "does not presently have any plan or proposal to liquidate General Host, to sell its assets . . . ." and that "it also may evaluate General Host's operations to determine whether there should be any disposition of assets." This statement is found to be insufficient to meet the requirements of Section 14(e) under the circumstances of this case. The Court does not at this time pass upon the question of whether Triumph made an untrue statement of material facts, but rather finds, for the purposes of this proceeding, that it omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

b) Failure to disclose the applicability of foreign government controls.

In the Statute Law of England, there are at least two provisions which assert authority over corporate residents (such as Triumph Investment) and companies not residents of England over which corporate residents have direct or indirect control (such as Triumph).

The British Exchange Control Act 1947, confers power on the United Kingdom Treasury (hereinafter Treasury) to compel Triumph Investment to cause its non-resident companies to declare and pay dividends specified by the Treasury;[10] and to compel Triumph Investment to cause its non-resident com-

---

8. See Defendant's Exh. I-4.

9. See text accompanying note 1, *supra.* This point is still valid even if the higher asset figure is used.

10. Under Exchange Control Regulations currently in force, the Treasury usually expects remittances to the United Kingdom amounting to two-thirds of the consolidated net foreign earnings after aggregating all foreign earnings of all the foreign companies controlled by the United Kingdom corporate resident. Plaintiff's Exh. I-VV, p. 2, ¶ 6. However, at least for Triumph, Triumph Investment has obtained assurances from the Bank of England that the Treasury will not require Triumph Investment, for the time being, to cause Triumph to remit to the United Kingdom. Plaintiff's Exh. I-K, p. 40.

panies to realize any of their assets as directed by the Treasury.[11]

The Income and Corporation Taxes Act 1970, requires the consent of the Treasury before Triumph Investment can permit any of its non-resident companies to issue any shares or debentures.

There is no serious disagreement between the parties that should the tender offer for Host shares be successful, Host will be a non-resident company indirectly controlled by Triumph Investment, and the laws cited above will be applicable.

The contention centers on whether or not these laws will ever be invoked by the Treasury in a way adverse to Host's operations and business in the United States, and to the foreign minority shareholders (i. e., Host shareholders who do not tender and who become foreign minority shareholders by virtue of Triumph's acquisition of fifty-one percent of the outstanding shares).

From the evidence hastily assembled for the hearing on this motion it is impossible for the Court to assess the probabilities with respect to the use of these laws, now or in the future. However, some of the exhibits reveal that the laws are not dead letters, although they are apparently applied in a very low key manner, at the present time.

For instance, Triumph was required to obtain through Triumph Investment the consent of the Treasury before it made the April 28, 1972 stock offering. Plaintiff's Exh. I–K, p. 28. In the prospectus, Triumph characterized such consent as a "revocable general consent" which permits Triumph to issue common stock so long as the effect of the transaction would not be to terminate Triumph Investment's control of Triumph. The same document revealed

that Triumph Investment has been advised by the Bank of England that the Treasury would not require Triumph Investment, *"for the time being,"* to cause Triumph to remit to the United Kingdom dividends relating to Triumph Investment's interest in Triumph's consolidated net earnings after taxes, but went on to state that, "[h]owever, no assurance can be given that the Treasury will not, at a later date, change its position." (Emphasis added)

Other evidence of the present efficacy of the British statutes is contained in a telex of March 13, 1973 from Whyte to Gruber,[12] wherein Whyte indicates that Triumph Investment has applied for, but has not yet received the Treasury's consent for Triumph Investment to guarantee the $20,000,000 loan from Lloyds-Bolsa to Triumph for the purpose of financing the tender offer. Plaintiff's Exh. I–WW. See also Plaintiff's Exh. I–BBB, ¶¶ 2, 4, wherein the same necessary approval is discussed in a letter from Saul[13] to the Chief of Exchange Control of the Bank of England.

Triumph argues that the applicable provisions of the British control laws will most likely never be invoked in a way onerous to Host and Host's foreign minority shareholders. To buttress its position, it has introduced a telex signed by "Mallinson" of the English firm of Slaughter & May, which states, in part:

I am of the view that *in current circumstances,* it is realistic to say that the powers of the Treasury under Section 30(1) of the Exchange and Control Act 1947 are unlikely to be used adversely to Triumph American, or if it controlled General Host, [to] General Host, and that Treasury consent would not *under current circum-*

---

11. In addition to the applicable items set forth in the text, it is of more than passing interest that the Exchange and Control Act of 1970 could compel Triumph Investment to cause Host to furnish particulars as to its assets and business to the Treasury, and to cause Host to sell gold or specified currency that it is entitled to sell. *Id.*

12. Whyte and Gruber are both officers of Triumph. Whyte is also an officer of Triumph Investment. See p. 12, *supra.*

13. Saul is an officer of both Triumph and Triumph Investment. See p. 12, *supra.*

758

*stances* be refused under Section 482 of the Income and Corporation Taxes Act 1970 to an application by Triumph Investment to permit the issue by Triumph American or General Host of securities on a bona fide commercial basis, *with the one exception* that the Treasury might be concerned if the result of the issue was that Triumph Investment would cease to control the foreign subsidiary concerned. . . .

Defendant's Exh. I–16 (Emphasis added).

"Mallison" goes on to state that "I think that what appears to be our [Slaughter & May's] total lack of experience of the operation of this sub-section indicates that in the past at any rate the officials of the Control have acted reasonably and with tact."

Host has countered with its English law "expert", John Nowell-Smith of Freshfields, a firm of English solicitors. His affidavit does not purport to setforth an opinion as to the probabilities of adverse enforcement, but rather establishes that the laws exist and points out the provisions which, in fact, the Treasury could invoke, should Triumph's tender offer succeed. Plaintiff's Exh. I–VV.

In the Court's view, the shareholders of Host are entitled to know no less. Triumph's "expert" has said that the purpose of these two statutes is "protection of foreign exchange and balance of payments" and "protection of United Kingdom tax revenue." Given the current pressures and instability in the international world of finance, no one, not this Court, not either party, and probably not the Treasury of the United Kingdom can say with any certainty when these laws might be enforced with less "reasonableness and tact". Furthermore, it seems likely that the Treasury of the United Kingdom would have an understandably different view of what is "reasonable" should circumstances arise that require assertion of the British national interest with respect to that country's balance of payments.

Triumph itself felt that the existence of these laws was significant enough to set them forth in some detail in its prospectus dated April 28, 1972 (Plaintiff's Exh. I–K, p. 28) announcing the issuance of Triumph shares. Triumph has argued that SEC regulations are more stringent with respect to disclosure where the prospect is being encouraged to buy (stock offers) rather than to sell (tender offers). That may have some technical validity, but we are not dealing here solely with SEC minimum standards.

In the Court's view, both the existence of the Treasury authority to manipulate the operations and business decisions of a company such as Host, *and* a factually based opinion as to the probability or lack of probability of adverse consequences, are facts which the reasonable investor should have in order to make an informed decision to tender or not to tender, or to tender some and withhold some shares. Triumph, by revealing that Triumph Investment is an English company and that it owns eighty-two percent of Triumph, and that it sought control of Host, put the Host shareowning public on notice that a foreign parent was in the picture. But the facts omitted with respect to British law are not facts which the reasonable investor is apt to know himself, or could be expected to find out on his own. Foreign controls, particularly when they differ in extent and kind from controls the U.S. investor has come to expect from the U.S. government in relation to domestic corporations, are matters which should be called to the attention of shareholders in a tender offer.

*Balancing the equities*

Defendant Triumph asserts that if a preliminary injunction is granted it will be irreparably injured in that: other tender offers might be made while awaiting the case being tried on the merits, resulting in shareholders tendering to others while Triumph is enjoined;

Host will have the advantage of a lengthy period of time to place obstacles in the way of Triumph; Host shareholders would lose confidence in Triumph and would not tender; and arbitrageurs would hesitate to continue to buy Host stock with a view to tendering.

█ The principal harm which Triumph will suffer should the application for a preliminary injunction be granted is that it will be unable to consummate its tender offer at such time as it deems ripe and profitable. This Court has determined that there is the probability that there has been an unlawful tender offer in that Host shareholders have not been honestly and fairly informed by Triumph. Triumph has no inherent right to proceed with an unlawful tender offer. "A requirement of lawfulness is included by implication in every tender offer." Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., *supra*, 473 F.2d at 698. Further, also as in the *Gulf & Western* case, if this Court permitted the tender offer to be consummated and at some later date was to find the violations charged by Host were valid, ". . . it would be almost impossible to unravel the situation." Id. at 698, quoting Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 356 F.Supp. 1066, 1074 (S.D.N.Y., 1973).

If after a trial on the merits Triumph is vindicated, it will not be foreclosed from renewing its offer.

*Remedies*

██ In view of the serious possible consequences which can result from the granting of preliminary injunctive relief in matters such as these, this Court must consider the various forms of relief which might be invoked in order to: protect the public interest; protect shareholders so that they might be fully informed of all material facts; avoid, where possible, frustrating the desires of those who may wish to tender when all the facts are known, should the ten-der offer be extended. See Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842,. 844–845 (2 Cir. 1970). While an assessment of certain 14(e) issues for the purpose of making a determination of this motion has been made, the Court remains confronted with issues raised by claimed violations of the Shipping Act, the Communications Act and several alleged failures to disclose material facts under the securities law, including Triumph's alleged investment company status, the possible adverse consequences of direct investment abroad, and the alleged group source of the tender offer. Further, there is an alleged violation of the margin requirements of the securities law which presents serious questions going to the merits and requires a complete record upon a trial in order that findings of fact essential to a determination of the issue may be made.

While the 14(e) issues preliminarily determined in this opinion directly affect the parties to the action and the Host shareholders, some of these remaining issues affect the public interest as well.

Corrective relief requiring recission and disclosure of those facts which the Court has determined should have been revealed by Triumph might avoid frustrating the desires of those who wish to tender when all the facts are known, but it will not suffice to protect the interests of the public should it be determined upon trial that Host's allegations, such as the claimed margin requirement violation, have been sustained. By then, the situation indeed would be almost impossible to unravel.

The Court concludes that the opportunity for doing equity is considerably better now than later and that the balance of hardships tips sharply in favor of granting preliminary injunctive relief which enjoins consummation of the tender offer, thereby maintaining the status quo. See Electronic Speciality Co. v. International Controls Corp., 409 F.2d 937, 947 (2 Cir. 1969).

**760**

This opinion shall constitute the findings of fact and conclusions of law of this Court, pursuant to Fed.R.Civ.P. 52.

For the above reasons, a preliminary injunction shall issue against Triumph American, Inc., its officers, its agents, servants, employees and all persons acting on behalf of or in concert with them.

Settle order on notice.

## ORDER

In view of the opinion of this Court filed today, granting a preliminary injunction against Triumph American, Inc., its officers, its agents, servants, employees and all persons acting on behalf of or in concert with them, it is

Ordered that Triumph American, Inc. shall not consummate its tender offer.