**CORENCO CORPORATION,**
Plaintiff-Appellant,

v.

**SCHIAVONE & SONS, INC., et al.,**
Defendants-Appellees,

and

**Chester K. Twiss et al., Additional Defendants to Counterclaim.**

Nos. 331, 521, Dockets 73–2216, 73–2286.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1973.

Decided Oct. 26, 1973.

Jerome Doyle, New York City (Leonard A. Spivak, George Wailand, Cahill, Gordon & Reindel, New York City, Richard L. Brickley, Brickley, Sears & Cole, Boston, Mass., of ·counsel), for plaintiff-appellant and additional defendants to Counterclaim.

Robert W. Sweet, New York City (Blaine V. Fogg, Thomas J. Schwarz, Edward J. Yodowitz, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for defendants-appellees.

William E. McCurdy, Jr., New York City (Lord, Day & Lord, New York City, of counsel), for defendant-appellee Reed Rubin.

Before MOORE, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

A familiar defensive tactic increasingly used by target companies to delay or thwart a take-over bid made by a tender

offeror has been the institution of a lawsuit against the offeror charging violation of the federal antitrust laws or non-disclosure of material information in violation of the Williams Act, Pub.L. 90–439, 82 Stat. 454, 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f). These actions have presented us with difficult and unusual questions. See, e. g., Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2d Cir. 1973); Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir.1973); SEC v. Bangor Punta Corp., 480 F.2d 341 (2d Cir. 1973). See generally E. Aranow & H. Einhorn, Tender Offers for Corporate Control (1973). The present case is no exception. It is novel in two respects. First, the district court, facing a question of first impression, held that the tender offeror, in this case a closely held company, should disclose financial data as to its own past operations, since this information might aid those solicited in deciding whether to tender or withhold their shares. Secondly, the principal appeal is not by the offeror, which has decided to abide by this aspect of the district court's decision, but by the target company, Corenco Corp., after it has successfully obtained a permanent injunction based on the offeror's failure to disclose its financial operations. Corenco appeals from a modification of that judgment which would permit the offeror to cure the deficiency by making the required disclosure to the offerees and giving them a right of withdrawal.

The original judgment entered on August 9, 1973, 362 F.Supp. 939, in favor of Corenco, the target company, after a trial before Judge Ward in the Southern District of New York, permanently enjoined Schiavone & Sons, Inc. ("Schiavone"), its parent company, Michael Schiavone & Sons, Inc. ("Michael Schiavone"), and Bear Stearns & Co., and all persons acting on their behalf (herein collectively referred to as "the Schiavone defendants") from (a) soliciting the tender of any shares of stock of Corenco, (b) acquiring any Corenco shares as a result of the tender offer, (c) further soliciting the proxies of holders of Corenco common stock, (d) voting any shares of Corenco common stock or proxies, (e) otherwise utilizing any such stock or shares of Corenco as a means of gaining control of Corenco "unless and until the Schiavone defendants make full disclosure of financial information about Schiavone and Michael Schiavone." The modification relieved the Schiavone defendants from the injunctive provisions of the order and judgment and permitted them to continue soliciting the tender of Corenco shares upon their filing with the Securities Exchange Commission (the "SEC") an amendment (containing financial statements for Schiavone and Michael Schiavone) to Schiavone's Schedule 13D statement and upon their distribution of an "Extended and Amended Offer to Purchase."

Corenco argues that the modification permitting the tender offer to proceed upon the filing of a curative amendment will encourage minimal disclosure by other tender offerors in the future and that it was based on the district court's mistaken belief that the Schiavone defendants intended to disclose as much financial information as they had furnished to the First Pennsylvania Banking & Trust Co. ("First Pennsylvania") in securing a loan to finance the tender offer.

Both Corenco and the Schiavone defendants also appeal from those portions of the district court's judgment of August 9, 1973, which dismissed certain of their various other claims and counterclaims.[1] Corenco alleges several other violations (besides the failure to

---

1. Corenco does not appeal from dismissal of Count 1 of its complaint, charging antitrust violations, or Count 5, which alleges that the Schiavone defendants solicited proxies for Joseph A. Schiavone and Joel Schiavone to vote the common stock of Corenco without supplying the persons solicited with a written proxy statement containing the information specified in Schedule 14A promulgated by the SEC under the Exchange Act.

disclose financial information about Schiavone and Michael Schiavone) of §§ 14(d) and 14(e) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78n(d) and 78n(e), and claims that prior to the public tender offer the Schiavone defendants together with Reed Rubin, a broker, conspired in violation of § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), to acquire or hold together more than 5% of Corenco's stock without making the required filings. The Schiavone defendants counterclaim that the Corenco management itself violated § 13(d) of the Exchange Act by failing to file a Schedule 13D statement while acting in concert to defeat Schiavone's offer.

For reasons hereinafter stated we hold that the district court acted well within its discretion in modifying its previous order and in permitting the tender offer to proceed upon the filing of a curative amendment. However, because we believe that the district court may have believed that the Schiavone defendants intended to disclose all of the financial information about themselves that they had previously furnished to First Pennsylvania, we remand for a determination by the district court as to whether the disclosure of Schiavone financial information as to earlier years should be required. In all other respects we affirm the modified judgment of the district court.

■■■ Although Corenco has challenged at length some of Judge Ward's findings of fact as contrary to the weight of the evidence, we are here governed by the "clearly erroneous" standard. Rule 52(a), F.R.Civ.P.; United States v. National Association of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). Under that standard the essential facts appear to be as follows. From time to time during and prior to 1972 Corenco, a publicly held corporation organized under Maine laws and engaged in production of tallow, fertilizers, shortening and industrial oils, offered a "finders fee" to Reed Rubin, a broker employed by Singer & Mackie, Inc., payable upon his finding any company successfully acquired by Corenco. In October, 1972, Rubin arranged a meeting between Corenco representatives and Joel Schiavone, vice-president of Michael Schiavone and president of Schiavone for the purpose of exploring preliminarily a possible acquisition of Schiavone by Corenco. Both Michael Schiavone and its subsidiary, Schiavone, are closely held corporations engaged in the scrap metals business. Although the companies and their industries were discussed generally at this meeting, no concrete proposal or plan emerged for a merger with or an acquisition by Corenco of the Schiavone companies. Thereafter discussions periodically took place between some or all of the representatives of both sides until on April 12, 1973, negotiations were terminated.

In the meantime, in January, 1973, Michael Schiavone began purchasing Corenco stock, initially for investment, using Rubin as its broker. These purchases continued throughout the first half of 1973 so that by July 3 Michael Schiavone held 18,300 shares or 4.8% of the 383,456 Corenco shares outstanding. Prior to March 12, 1973, Rubin himself had also purchased shares of Corenco stock, which were held in various accounts toward which he occupied a special relationship: as trustee of a trust established by Vera Rubin (12,965 shares), as investment "advisor" to his father, Samuel Rubin (4,950 shares),[2] and as director and treasurer of the Research Institute for the Study of Man (1,000 shares).[3] In the aggregate these acquisitions by Rubin totalled 4.996% of Corenco's outstanding shares. Prior to July 17, 1973 (the date when Schiavone

2. Although Rubin actually purchased the Corenco shares for his father, he claimed that the only control he had over these shares was the power he was given by a specific proxy to vote the shares at a specific annual meeting.

3. The principal contributor to this Research Institute was the Samuel Rubin Foundation.

made its tender offer) Rubin neither advised the Schiavone companies of these acquisitions nor did he know of Michael Schiavone's purchases of Corenco stock for purposes other than investment. Rubin, of course, was to be remunerated as a finder only if Corenco acquired Schiavone, not if Schiavone acquired Corenco.

On July 17, 1973, Schiavone announced publicly that it was offering to purchase shares of Corenco stock with the intent of gaining control of the corporation. Immediately before the announcement Schiavone filed with the SEC a statement on Schedule 13D as required by § 14(d) of the Exchange Act and an Offer to Purchase dated July 17, 1973. Schiavone offered to pay $33 net[4] per share for Corenco shares tendered prior to August 2, 1973, except that Schiavone would not be obligated to purchase fewer than 90,000 nor more than 130,000 Corenco shares. The Offer to Purchase also disclosed: that Michael Schiavone had already acquired approximately 4.8% of Corenco's common stock "for investment;" that Schiavone and Michael Schiavone would own approximately 28.6% of the outstanding Corenco shares if 90,000 shares were purchased and approximately 39.2% of the outstanding shares if 130,000 shares were purchased and that Schiavone's purpose in making the offer was to gain control of Corenco with a view to a possible merger or other combination of the two companies. The Offer also included financial information about Corenco and the market value of its stock, and information about the officers and directors of the Schiavone companies and the source of the funds required to finance the tender offer. However, the Offer did not contain any financial information as to Schiavone or Michael Schiavone.

On the next day, July 18, Schiavone published an announcement of its offer in the *Wall Street Journal*.[5] The announcement stated that it did not itself constitute an offer and advised readers that they could obtain copies of the printed Offer to Purchase from the Depository, the Forwarding Agent or the Dealer Manager. The announcement also explained that no tenders would be accepted unless made by a "duly executed" Letter of Tender which the shareholder could obtain only if he requested an Offer to Purchase.

Within a day or two after the announcement of the tender offer Corenco's management decided—by unanimous vote—to fight it. A series of letters were sent by the management to shareholders urging them to delay action on the offer and warning them that the offer was "inadequate." The letters were supplemented by press releases and hundreds of telephone calls. On July 23 the management declared an extra cash dividend payable to shareholders of record on August 3 (the day after Schiavone's offer was due to expire) and a 10% stock dividend payable to shareholders of record on August 21. In short Corenco made it clear that it would leave no stone unturned in its opposition to the bid.

On July 25 Corenco's management brought the present suit in the United States District Court for the Southern District of New York seeking an injunction against the tender offer. The complaint alleged that the proposed acquisition would violate § 7 of the Clayton Act, 15 U.S.C. § 18, by precluding a potential competitor from entering the market. It also claimed that the "announcement" in the *Wall Street Journal* itself constituted a tender offer within the meaning of § 14(d) of the Exchange Act and hence was illegal because it failed to include the required information, and that the Offer to Purchase contained several material misstatements and omissions in violation of § 14(e) of the

---

4. On July 16, 1973, the bid price for Corenco stock which was trading over-the-counter was $26.50. The asked price was $28.00 per share.

5. The announcement was subsequently republished in at least five other newspapers.

Exchange Act. The management also claimed that the Schiavone companies and Reed Rubin had violated § 13(d) of the Exchange Act by collectively conspiring to acquire more than 5% of Corenco's stock without making the required filings. The Schiavone defendants counterclaimed alleging that Corenco's management itself had violated § 13(d) by acting in concert to oppose Schiavone's tender offer without filing a statement on Schedule 13D.

Both parties asked initially for preliminary injunctions against each other. At a subsequent hearing on their petitions, however, they stipulated, pursuant to Rule 65(a)(2), F.R.Civ.P., that the hearing would constitute a trial on the merits. After the hearing the district court, in a well reasoned opinion, dismissed most of Corenco's claims, including its antitrust charges. However, it held that in view of the circumstances of the case and the nature and purpose of Schiavone's tender offer, Schiavone should have disclosed financial information about itself and Michael Schiavone and that its failure to do so violated § 14(e) of the Williams Act. Judge Ward noted particularly that both Schiavone companies were privately held so that no financial information about them was publicly available, and reasoned that such information might be important to an investor seeking to decide whether he should sell his Corenco shares for $33 or retain them as an interest in a company that might be controlled by Schiavone if its solicitation of tenders should be successful. He further concluded that it would be material to a Corenco shareholder to have information as to the source of the funds available to repay the loan obtained by Schiavone from First Pennsylvania to finance the tender offer. Accordingly Judge Ward restrained the Schiavone defendants from acquiring any Corenco shares as a result of their tender offer "unless and until the Schiavone defendants make full disclosure of financial information about Schiavone and Michael Schiavone." The court dismissed the Schiavone defendants' counterclaim against Corenco.

The injunction was issued on August 9, 1973. On August 10, the Schiavone defendants moved the court pursuant to Rules 60(b)(5) and (6), F.R.Civ.P., for relief from the injunction to permit them to file with the SEC an amendment—containing financial information about Schiavone and Michael Schiavone —to Schiavone's Schedule 13D statement and to distribute an "Extended and Amended Offer to Purchase." In an affidavit in support of this motion Schiavone represented that the financial information contained in the proposed amendment "is the information which was submitted in confidence to the First Pennsylvania Banking and Trust Company in connection with the financing of the tender offer." On August 16, 1973, the court granted the Schiavone's motion on condition that the "Extended and Amended Offer to Purchase" state in bold face type that each shareholder who had already tendered his shares could withdraw them within 30 days and that the Amended Offer contained financial information about the Schiavone companies which had not previously been disclosed.

Corenco appeals from the court's August 16th order modifying its injunction and from its judgment entered on August 9, 1973, dismissing its various other complaints. The Schiavone defendants appeal from the district court's dismissal of their counterclaim. Corenco further contends for the first time upon this appeal that since Michael Schiavone supplied First Pennsylvania with financial statements for the five-year period from February 1968–1973, whereas in its amendment Schiavone disclosed financial statements for the Schiavone companies only for the years ended February 1972 and 1973, Schiavone's amendment was in any event inadequate.[6]

---

6. Corenco alleges that Schiavone misled the court and Corenco into believing that the financial information furnished in the amendment represented the entire data disclosed to

### The Permission to Make Curative Amendments

■ Corenco argues that in view of Schiavone's deliberate [7] failure to reveal even limited financial information about itself and Michael Schiavone until a permanent injunction had been entered against it, the modified order permitting further curative amendments containing the essential financial information violates the principle underlying the Supreme Court decision in J. I. Case Co. v. Borak. 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), that "remedies should be designed to encourage compliance with the law." Here, Corenco asserts, the remedy is so minimal that future tender offerors will be encouraged to make the least disclosure possible until compelled by court order. Corenco urges, as a more appropriate remedy, that Schiavone be required, if it desires to pursue the acquisition, to start over, making a wholly new tender offer after all previously tendered shares have been returned and a "cooling off" period has expired. The purpose and effect of such a provision would be to penalize Schiavone for its non-disclosure and deter offerors generally from playing their cards too close to the vest.

If Schiavone's conduct had represented an effort on its part, with knowledge that Corenco shareholders were entitled to the financial information, to prevent them from obtaining it, there might be merit to Corenco's proposal as a means of insuring future compliance with the Williams Act. But we think that Corenco attributes to Schiavone guilty knowledge and intent which it is not shown to have possessed. The district court's order of August 9, 1973, was the first time that the new Williams Act had been construed to require a tender offeror to disclose financial information about itself. Since Schiavone does not challenge this provision of the court's order, it is not an issue before us. However, until the district court's ruling the question was far from clear and a respectable argument could be made that such information was at best of peripheral significance.[8] Ordinarily a stockholder receiving a tender offer is primarily interested in the cash price. Although he may decide not to accept an offer if he believes that the proposed takeover of control will strengthen his investment and the offeror is not exactly anxious to encourage such a course, it is clear that if all stockholders rejected the offer, there would be no such strengthening of his investment. Hence, the offeror's financial condition is at best a secondary factor.[9] Once the tender offeror's obligation to reveal past financials is established, however, it would be self-defeating for an offeror not to include the information from the outset. Failure to include such information from the outset would lead inevitably to additional loss of time and expense. Hence we cannot agree that allowance of a curative amendment here, where an

First Pennsylvania. However, the loan agreement between Schiavone and that bank, then in Corenco's possession, revealed that five years' financials had been furnished to the bank.

7. In its brief, Corenco points to Joel Schiavone's testimony in these proceedings that the reason for not disclosing any financial information regarding the Schiavone companies was "that Corenco stockholders may not have tendered had this information been available to them."

8. It is significant that, although the SEC, acting pursuant to authority delegated to it by §§ 13(d) and 14(d) of the 1934 Exchange Act, adopted rules requiring certain disclosures to be made by a cash tender offeror, information as to the offeror's financial condition was not specified. Furthermore, the SEC's proxy rules (Reg. 14A under Securities Exchange Act of 1934), which form the basis of the disclosures the Williams Act seeks to require, see S.Rep.No.550, 90th Cong., 1st Sess. 3 (1967), do not obligate the disclosure of such financial information regarding a company or group seeking control.

9. In contrast, where an exchange offer is made, information as to the financial operations and condition of the offeror is clearly of material significance since it enables the offeree to form a judgment as to the value of the package offered in exchange.

obligation to disclose past financials was found for the first time, will encourage deliberate violations of the Williams Act in the future.

In permitting the Schiavones to remedy the deficiency the court was adhering to a logical method of securing compliance with the Exchange Act which we have previously endorsed. See Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. July 3, 1973) [Current] CCH Fed.Sec.L.Rep. ¶ 94,041 (2d Cir. 1973). Cf. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969); Butler Aviation International, Inc. v. Comprehensive Design Inc., 425 F.2d 842, 844–845 (2d Cir. 1970). Bath Indus. Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970), to which Corenco refers us, involved a late rather than an insufficient filing and the court there emphasized the broad discretion of the trial court in fashioning remedies.

We are not impressed by Corenco's emphasis on Schiavone's delay in disclosing its financials until it was *permanently* enjoined from proceeding with its tender offer. Curative amendments should not be proscribed merely because the parties agree under Rule 65, F.R. Civ.P., to merge their applications for preliminary and final relief into one trial. Such a result would obviously discourage stipulations under the Rule.

Aside from its quarrel with the wisdom of allowing a curative amendment in this case, Corenco asserts that the district court had no power under Rules 60(b)(5) and (6), F.R.Civ.P., to grant relief from its former permanent injunction because the Schiavone defendants had not shown that they were "seriously and needlessly impeded" by the injunction and that relief was necessary "to achieve the results intended." See

King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31 (2d Cir. 1969). The short answer to this is that the injunction, being expressly limited in duration "until the Schiavone defendants make full disclosure of financial information about Schiavone and Michael Schiavone," reserved to the court the discretionary equitable power to modify its terms. Neither *King-Seeley* nor any of the cases relied on by Corenco involved injunctions expressly limited in duration. Compare United States v. Swift, 286 U.S. 106, 52 S.Ct. 460, 76 L. Ed. 999 (1932) (meatpackers enjoined from selling groceries), and United States v. United Shoe Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (shoe machinery manufacturers restrained in various ways) with Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803 (8th Cir.), cert. denied, 395 U.S. 905, 89 S.Ct. 1745, 23 L. Ed.2d 218 (1969) (oil companies "perpetually" enjoined from using certain names). Even assuming that the standards set forth in *King-Seeley* for the court's exercise of discretionary power are applicable here, relief from the permanent injunction was clearly permissible once the specific results intended—disclosure of financials by Schiavone—had been achieved.

■ We think that Judge Ward acted well within his discretionary power in permitting the tender offer to proceed upon the filing and distribution of a new amendment disclosing financial information about Schiavone and Michael Schiavone. We are troubled, however, by the possibility that he may have believed that Schiavone was disclosing all of the financials that it had previously furnished to First Pennsylvania instead of those for the last two out of the five years given to the bank.[10] Since this is-

---

10. We do not believe that the statement in the Schiavone defendants' affidavit in support of its motion under Rule 60(b)(5) and (6) was deliberately deceptive since the adequacy of the proposed financial disclosures had not been challenged. Any attempt to conceal the fact that the proposed disclo-

sures were not as extensive as those made to First Pennsylvania would have been pointless. Furthermore, the SEC, which reviewed the financials for the last two years and made certain suggestions that have been incorporated in the financial information contained in Amendment 7, did not suggest

sue was raised for the first time on appeal, we remand the case to the district court to determine in its discretion whether the Schiavone defendants should furnish financial statements for the three earlier years. The district court may also want to review the form of the financial disclosures, which has been questioned by the staff of the SEC.[11]

*Dismissal of Other Claims Brought Under § 14(d) and (e) of the Exchange Act*

Corenco argues that the district court erroneously dismissed its several other claims under § 14(d) and (e) of the Exchange Act: that Schiavone's "announcement" of its tender offer in the *Wall Street Journal* on July 18 1973, itself constituted a tender offer which should have included all the information required by § 14(d); that Schiavone's original Offer to Purchase misrepresented that Michael Schiavone's purpose in acquiring approximately 4.-8% of Corenco's common stock prior to the tender offer was "for investment;" and that the original Offer to Purchase failed to disclose the likelihood or possibility that Corenco's assets would be converted into cash for use in repayment of the loan taken by Schiavone to finance the tender offer. We find no merit in these claims and affirm the district court's dismissal of them.

Schiavone's "announcement" in the *Wall Street Journal* fell short of being a tender offer within the meaning of § 14(d) since it specifically stated that it did not itself constitute an offer and that tenders could be made only after the Corenco shareholder had obtained a printed Offer to Purchase and Letter of Tender. In another context we have recognized that an announcement of an offer may be different from an offer. See Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 574 (2d Cir. 1970); Rules 134, 135, Securities Act of 1933. In the absence of a statutory checklist of features that may be included in a tender offer announcement which does not also constitute a tender offer, courts are left to develop a "rule of reason." *Id.* The purposes of the Williams Act would not have been furthered significantly in this case if Schiavone had included in its newspaper announcement all the information found in its 24-page Offer to Purchase, which was readily available and which a Corenco shareholder would as a practical matter have to obtain before he could tender his shares, since the Letter of Tender required to be submitted by each tendering shareholder could be obtained only by stockholders who also received a copy of the Offer.

Section 14(e) of the Exchange Act prohibits only material misstatements in connection with a tender offer. Even assuming that the statement in the original Offer to Purchase concerning Michael Schiavone's purpose in acquiring Corenco stock prior to the tender offer was inaccurate, since Michael Schiavone may have acquired some shares after Schiavone decided to seek control of Corenco, Corenco does not explain how the misstatement was material. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Indeed Corenco concedes that this information regarding the purpose of pre-tender offer purchases was not required under §§ 13(d) and 14(d) of the Exchange Act. Even if the

---

inclusion of earlier financials, possibly for the reason that its Rule 14a–3, dealing with the analogous procedure for disclosure of financial information in annual reports used in proxy statements, requires disclosure of only the last two years financials. In addition, Schiavone's first quarter earnings for 1973, which are disclosed in Amendment 3, represented a substantial improvement over the earlier two years.

11. The financial statements of Schiavone and Michael Schiavone which were incorporated in the new amendments to Schiavone's Schedule 13D statement were unaudited. When the amendments were filed with the SEC, the staff suggested that certain changes be made. These suggested changes were incorporated in Amendment 7 which was filed with the SEC on August 31, 1973.

misstatement was material, Schiavone corrected it in its first amendment (filed July 30, 1973) and the district court could well have concluded that no further action was necessary.

We do not agree with Corenco's assertions that if the tender offer is successful a conversion of its assets into cash to be used to repay bank loans made to finance the offer is "likely" or "probable." If the offer is successful, the income and assets of both Schiavone and Michael Schiavone, which has consolidated assets in excess of $17.5 million and a net worth in excess of $6.8 million, will be available. Thus conversion of Corenco's assets, unlike the situation in General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749 (S.D. N.Y.1973), appears most unlikely. But even if such a conversion were likely, we would only require a disclosure of the circumstances rather than a specific statement that a conversion was likely to occur. *General Host Corp., supra,* 359 F.Supp. at 755. This the district court has already done by requiring Schiavone to disclose financial information about itself and Michael Schiavone.

*Dismissal of Corenco's Claim Under §
13(d) of the Exchange Act*

Corenco argues that the Schiavone defendants and Reed Rubin were a "group" within the meaning of § 13(d)(3) of the Exchange Act,[12] and were required to file a Schedule 13D statement by reason of their purchases and holding of Corenco shares prior to July 3, 1973. More specifically, Corenco maintains that the district court erroneously required it to show that Rubin and the Schiavone defendants conspired or agreed *to acquire* Corenco stock before July 3 whereas under the decision of this court in GAF Corp. v. Milstein,

453 F.2d 709 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L. Ed.2d 821 (1972), as opposed to the decision of the Seventh Circuit in Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970), a plaintiff must show only that the defendants conspired to acquire *or hold* more than 5% of a company's stock.

Judge Ward's reference to the necessity of showing a conspiracy to acquire Corenco stock[13] merely summarized the language of Corenco's own complaint, which alleged that "at least as early as January 1973" Joel Schiavone had agreed with Reed Rubin to acquire over 5% of Corenco stock "and/or to acquire control of Corenco," that pursuant to this agreement Joel Schiavone and Reed Rubin secretly acquired substantial amounts of Corenco stock (Par. 10) and that "while owning in excess of 5% of such securities [they] agreed to act in concert to acquire control of Corenco" (Par. 22). In any event the distinction between an agreement to "acquire" and an agreement to "hold" appears immaterial in this case since Judge Ward found insufficient evidence of any agreement whatsoever between Rubin and Schiavone defendants regarding their respective holdings of Corenco stock. It is true that Michael Schiavone controlled 4.8% of Corenco's outstanding shares. Rubin, assuming for present purposes that he exercised sufficient dominion over the three accounts for which he had purchased shares, would have controlled another 4.996%. These percentages indicate an acute awareness on the part of both parties of the 5% figure fixed by § 13(d). However, absent an agreement between them a "group" would not exist. While it is charged that Rubin met several times

---

12. Section 13(d)(3) provides:
"When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

13. Judge Ward began his discussion of Corenco's claim under § 13(d) by writing: "It is essential to Corenco's claim under section 13(d) of the 1934 Act that Corenco prove an agreement or conspiracy between the Schiavone defendants and Reed Rubin to acquire Corenco stock."

**218**

with Joel Schiavone during the period of Michael Schiavone's purchases, Judge Ward noted that Rubin's fee depended on Corenco acquiring Schiavone rather than vice versa and that some Corenco stock was actually sold out of the accounts allegedly controlled by Rubin during the period of the supposed conspiracy. Upon this record we cannot conclude that Judge Ward's finding of no agreement or conspiracy was "clearly erroneous."

### The Schiavones' Counterclaim Against Corenco

 Turning to the Schiavone defendants' counterclaim that Corenco's management and their affiliates were a "group" within the meaning of § 13(d)(3) and were required to file a Schedule 13D statement by reason of their pooling of their Corenco shares for the purpose of defeating the tender offer, it is unclear what "independent interest" protected by the statute exists which gives the Schiavone defendants standing to assert their counterclaim. See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 944-946 (2d Cir. 1969). Assuming they have standing, however, we are satisfied that the members of Corenco's management were not required to file individual Schedule 13D statements when they agreed to pool their interests to fight the threatened takeover.

Section 14(d)(4) of the Exchange Act specifically requires the disclosure of certain information when the management of a company advises its shareholders to reject a tender offer.[14] Corenco's management complied with this section when it filed a form 14D. Since the Exchange Act contains a specific provision governing the disclosures required of a target company's management, it would be pointless to superimpose requirements found in another section, which does not deal specifically

with management disclosures. The reliance placed by the Schiavone defendants on GAF v. Milstein, *supra*, is misplaced. There the court expressly declined to decide the question "whether management groups which expressly agree to pool their interests to fight a potential takeover are subject to section 13(d)." 453 F.2d at 719 n. 20.

### Conclusion

We affirm the district court in all respects except that we remand the case to it for a determination, in the exercise of its discretion, whether the Schiavone defendants should be required to disclose their financials for the past five years rather than the past two years. If it should so conclude, the form of any such disclosures might be approved by the district court without necessarily awaiting approval by an administrative agency.

**Roger FAIN, Petitioner-Appellee,**

v.

**Ed DUFF, etc., Respondent-Appellant.**

**No. 73-1933.**

United States Court of Appeals, Fifth Circuit.

Dec. 7, 1973.

Rehearing En Banc Denied March 1, 1974.

---

14. Section 14(d)(4) provides:

"Any solicitation or recommendation to the holders of . . . a security to accept or reject a tender offer shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Robert L. Shevin, Atty. Gen., Raymond L. Marky, Asst. Atty. Gen., Tallahassee, Fla., John W. Tanner, Asst. State Atty., 7th Judicial Circuit of Fla., Daytona Beach, Fla., for respondent-appellee.

Philip H. Elliott, Jr., Daytona Beach, Fla., Thomas A. Goldsmith, San Francisco, Cal., for petitioner-appellee.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Sixteen-year-old Roger Fain was arrested November 12, 1970, in Volusia County, Florida, for breaking into the home of a woman and raping her. Eleven days later Fain was adjudged delinquent by a juvenile court. Nine days after the juvenile proceedings, a grand jury returned an indictment charging Fain with the criminal offense of rape. After the state courts of Florida rejected Fain's argument that prosecution of him for rape would violate the former jeopardy clause of the Fifth Amendment to the Constitution, Fain obtained a writ of habeas corpus from the United States District Court for the Middle District of Florida. The state now appeals the granting of the writ. We affirm.

Although this case involves complicated constitutional and statutory questions, the facts are simple and undisputed. On November 12, 1970, Roger Fain, then aged sixteen years and nine months, was arrested by Ormond Beach police officers for the alleged rape the day before of Mary Frances Oswald in Volusia County, Florida.[1] Five days later, a counselor of the juvenile court system filed a petition in juvenile court alleging that Fain was a delinquent child by reason of having assaulted and raped Mrs. Oswald.[2] On November 23, 1970, a hearing was held in the Volusia County Juvenile Court, during which an assistant state attorney appeared and urged the judge to waive jurisdiction and certify the case to the circuit court.[3]

---

1. F.S.A. § 39.03(1)(b) allows a police officer to arrest a juvenile who is "alleged to have committed a violation of law."

2. F.S.A. § 39.05 specifies procedures for filing petitions "in the interest of" juveniles in juvenile courts.

3. F.S.A. § 39.09 prescribes procedures for juvenile court hearings. F.S.A. § 39.02(6)(a) provides that a juvenile court judge may, after a hearing, transfer a child who is 14 years of age or older to the court which would have jurisdiction over the child if he were an

I

---

adult. The decision to waive jurisdiction is, by implication, left in the discretion of the juvenile court judge.