**CITADEL HOLDING CORP., a Delaware corporation, Plaintiff–Appellant,**

v.

**Alfred ROVEN; American Underwriters, Inc., a Delaware corporation, Defendants–Appellees.**

**No. 92–55915.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1993.

Decided June 9, 1994.

Kirsten Hicks Spira and Martin C. Washton, Gibson, Dunn & Crutcher, Los Angeles, CA, for plaintiff-appellant.

Jeffrey Q. Smith, Cadwalader, Wickersham & Taft, New York City, and Richard C. Field, Cadwalader, Wickersham & Taft, Los Angeles, CA, for defendants-appellees.

Before: TANG, D.W. NELSON, and LEAVY, Circuit Judges.

Opinion by Judge D.W. NELSON.

D.W. NELSON, Circuit Judge:

## OVERVIEW

Citadel Holding Corporation ("Citadel") appeals the district court's grant of summary judgment in favor of Alfred Roven ("Roven") and American Underwriters, Inc. ("American") in an action filed by Citadel under § 16(b) of the Securities Exchange Act of 1934 ("the Act"). 15 U.S.C. § 78p(b) (1988). Citadel seeks disgorgement of profits allegedly realized by Roven through short-term transactions with private brokerage houses in options referencing Citadel stock. We have jurisdiction pursuant to 15 U.S.C. § 78aa. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Citadel is a savings and loan holding company incorporated under the laws of the

State of Delaware, with its principal place of business in Glendale, California. Its common stock is listed and traded on the American Stock Exchange. Alfred Roven ("Roven") is the Chairman of the Board of Directors and the sole shareholder of American Underwriters, Inc. ("American"), a securities and real estate investment company. At the time that Roven, through American, entered into the private option contracts at issue here, he was a director of Citadel, and therefore was a statutory "insider" within the meaning of § 16(b) of the Act.

There were two legal restrictions against any shareholder or prospective shareholder acquiring more than 10% of Citadel's common stock during the 1985–87 time period. First, no person could own more than 10% of a savings and loan's common stock without approval from the Federal Home Loan Bank Board ("Bank Board"). *See* 12 U.S.C. §§ 1730a, 1730(q) (1988). Second, Article 8 of Citadel's Certificate of Incorporation expressly prohibited any person "significantly engaged" in an "unrelated business activity" from owning more than 10% of the Citadel stock (the "Article 8 restriction"). At all relevant times, Roven held 313,000 shares of Citadel's common stock, approximately 9.8% of all the company's outstanding shares.

On October 8, 1985, Roven negotiated with Bear Stearns & Co. ("Bear Stearns") to purchase call options on behalf of American. In exchange for an initial payment of $750,000, Roven received the right to purchase, at a pre-determined price, 150,000 shares of Citadel stock (the "Bear Stearns option"). Roven's rights under the contract were nontransferable, and his option to purchase the 150,000 shares was exercisable only in its entirety. The agreement provided for an initial exercise period of only thirty days, but Roven had the right to extend the agreement for subsequent thirty-day periods so as to maintain his option position. Although Roven could not sell his option on the open market, he was free at any time to sell the option back to Bear Stearns at a price linked to the market price of the underlying securities.

The Bear Stearns option gave Roven no voting rights with respect to the underlying Citadel stock, and there is no evidence that Roven directly or indirectly obtained added leverage over the management of Citadel as a result of the agreement. Roven had a right to receive dividends on the underlying Citadel stock, although no such payments were made during the time that he maintained the option position.

Roven renewed the Bear Stearns option over two years, maintaining his option on precisely 150,000 shares irrespective of changes in the price of the underlying stock and irrespective of whether the extensions represented a net profit or loss. The extensions were accomplished through a series of "rollovers" that occurred either immediately prior to the scheduled expiration date or when the price of the Citadel stock referenced in the agreement hit a specified "trigger" price. Each extension resulted in a new exercise price and a new purchase price.

From May 21, 1986 through August 14, 1987, Roven withdrew cash from his Bear Stearns account on at least nine separate occasions. These withdrawals were conditional receipts of funds that Roven was required to repay if and when the securities declined in value. From the time the Bear Stearns option was originated in October 1985, through October 1, 1987, Roven paid a total of $5,288,720 to extend the position and withdrew a total of $5,289,569 from the account. No money was withdrawn until more than seven months after the agreement was initiated, and when the stock market crashed in October, 1987, the contract expired worthless. Roven never exercised the Bear Stearns option.

In April 1986, Roven negotiated, through American, three call option contracts referencing Citadel stock with another broker, Prudential Bache Securities, Inc. ("Prudential Bache"). In exchange for $286,875, $284,700, and $277,625, respectively, Roven received the right under each of the three contracts to purchase 25,000 shares of Citadel common stock, for a total of 75,000 shares. The Bache options worked much as did the Bear Stearns option, except that the Bache options had an initial term of thirty to forty-five days. American paid a total of $1,068,335 with respect to the acquisition and

extension of the first and third Bache options. American, however, neither withdrew nor was paid any money with respect to these two options, and never closed them out. Roven extended the second Bache option by a series of payments in the aggregate amount of $490,700. On October 29, 1986, Roven closed out the option and, as a result, received funds from Prudential Bache in the amount of $559,650. Roven received these funds six months and seven days after he acquired the option. Roven never exercised any of the three Bache options.

Roven made no effort to disguise the transactions. Roven and American timely filed amendments to their Schedule 13D publicly disclosing the acquisition of the Bear Stearns and Bache options, and appended copies of the trade confirmations and other descriptive material. Roven also disclosed the options in filling out Citadel's annual directors' and officers' questionnaires. Despite these disclosures, Roven concluded that, because the options were not "presently exercisable," he had no obligation separately to report the transactions pursuant to § 16(a).[1]

Citadel's 1986 annual proxy statement, which was filed with the SEC and distributed to shareholders, stated with respect to the Bear Stearns option (the Bache options not yet having been acquired) as follows:

> American has acquired an option giving it the right to purchase from a third party 150,000 shares of Citadel common stock, which option by its terms cannot be exercised until all required filings have been made with, and all required approvals have been obtained from, the appropriate regulatory authorities.

On or about May 29, 1987, Citadel filed with the SEC, and transmitted to its shareholders, a copy of its 1987 annual proxy materials. Once again, Citadel made reference to the options, this time implicating both the Bear Stearns and Bache agreements. Citadel noted that Roven's ownership of Citadel stock "[did] not include options with respect to 200,000 shares constituting approximately 5.77% of the issued and outstanding shares ... that cannot be lawfully exercised until certain required filings have been made with, and certain required approvals have been obtained from, the Federal Home Loan Bank Board." Citadel's 1987 proxy statement also discussed the Article 8 restriction.

Citadel filed this action on October 9, 1987, in the District Court for the Central District of California, seeking disgorgement of profits allegedly realized by Roven through his purchase and sale of the options. Roven emphasizes that he was prohibited by law from purchasing additional Citadel stock without prior federal and corporation approval, and maintains that he purchased the options so as to be able to increase his ownership of Citadel were he to obtain the necessary approvals. Citadel, however, claims that Roven was able to use the options to speculate in Citadel stock in violation of § 16(b). Pursuant to the terms of § 16(b),[2] Citadel was required to show that Roven (1) realized a

---

1. Section 16(a) of the Act provides in relevant part as follows:

> Every person who is ... a director or an officer of the issuer [of any class of equity security], shall file ... a statement with the Commission ... of the amount of all equity securities of such issuer of which he is the beneficial owner, and[,] within ten days after the close of each calendar month thereafter, if there has been a change in ownership during such month, [the person] shall file ... a statement indicating ... such changes ... as have occurred during such calendar month.

15 U.S.C. § 78p(a) (1988). As discussed at length below, SEC Rule 16a–6(a), as it existed at the time of the transactions at issue here, brought most options within the scope of the § 16(a) reporting obligation, exempting only options that were not "presently exercisable." *See* 17 C.F.R. § 240.16a–6(a) (1989).

2. Section 16(b) provides in pertinent part as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by [a] ... director ... by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer.... This subsection shall not be construed to cover ... any transaction or transactions which the [Securities and Exchange] Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b) (1988).

profit, (2) from a purchase and sale or sale and purchase within a period of less than six months, (3) of an equity security of Citadel, (4) in a transaction that was not exempt by the rules and regulations of the Securities and Exchange Commission ("SEC").

In November, 1988, Roven moved for summary judgment on the ground that the options were not equity securities of Citadel within the meaning of § 16(b), and on the alternative ground that the options were not "presently exercisable" and thus exempted by SEC Rules 16a–6 and 16a–10. The motion for summary judgment was denied, and on November 3, 1990, Roven made a renewed motion for summary judgment. While the matter was under submission, the case was transferred to Judge Pfaelzer.

On June 16, 1992, Judge Pfaelzer filed an order granting Roven's renewed motion for summary judgment, finding that Citadel had failed to raise a genuine issue of material fact with respect to three issues. The district court held that: (1) as a matter of law and fact, there was no "purchase and sale" or "sale and purchase" within a period of less than six months; (2) Citadel failed to raise a genuine issue of material fact concerning whether any profits arising from the option transactions were "realized" within less than six months; and (3) the option transactions were exempt from liability under § 16(b) because they were not "presently exercisable."

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *See Colan v. Mesa Petroleum Co.*, 951 F.2d 1512, 1518 (9th Cir. 1991), *cert denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Where a claim requires proof of multiple elements, as does the § 16(b) claim here, Fed.R.Civ.P. 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

## ANALYSIS

We agree with the district court that Roven's option transactions were exempt from § 16(b) liability because the options were not "presently exercisable." Because this conclusion alone is sufficient to support the district court's grant of summary judgment, we do not reach any of the other contentions raised by the parties.

As a preliminary matter, we note that when the SEC effected its first comprehensive revision of the Section 16 regulatory scheme in 1991, it rewrote its rules governing reporting of, and liability for, transactions in derivative securities. The SEC explained the reason for the change as follows:

> The former Commission Section 16 rules and case law, by failing to recognize the functional equivalence of derivative securities and the underlying securities, and by therefore focusing on the exercise, rather than the acquisition, of the derivative security, have left open a significant potential for short-swing abuse in trading derivative securities.

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release 28869 [1990–91 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,709 at 81,261 (February 8, 1991). In its new regulatory scheme, the SEC thus "reversed" its prior approach, "realigning the Section 16(b) focus from the exercise of the derivative securities to the acquisition of the derivative securities," *id.,* and rewrote its rules interpreting § 16(a) in order to make "the acquisition of a derivative security as a reportable event, whether or not the security is presently exercisable," *id.* at 81,264.

■ Although the new regulations, if applicable, clearly would have a significant impact on our analysis, we are obligated to evaluate this case according to the SEC rules operative at the time of the disputed transactions, as long as those rules were not inconsistent with the dictates of § 16 of the Act. See 15 U.S.C. § 78w(a)(1) (1992) (Section 23(a)(1) of the Act) ("[n]o provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or order of the [Securities and Exchange] Commis-

sion"). *See also, Greene v. Dietz,* 247 F.2d 689, 694–95 (2d Cir.1957) (holding that § 23(a) serves to immunize from § 16(b) liability those corporate insiders who structure their option transactions in good faith reliance on existing SEC rules and regulations); *Colema Realty Corp. v. Bibow,* 555 F.Supp. 1030, 1040 (D.Conn.1983) (same). Roven had a right to rely on SEC rules and regulations as they existed at the time of the transactions in question, and, whatever results might obtain under the new regulatory framework, our task is to apply the statute as interpreted through those former SEC regulations.

■ Section 16 of the Securities Exchange Act of 1934 contains two separate provisions. Section 16(a) requires that all officers, directors, and large shareholders report to the SEC any changes in their "beneficial ownership" of equity securities of their corporations. Section 16(b) imposes liability on such "insiders" for short-swing transactions in such securities. The reporting requirements in § 16(a) serve to provide a record of acquisitions and dispositions of securities so that, when a challenge is brought under § 16(b), the SEC readily can determine whether the insider has violated the terms of the statute. Although § 16(b) is a relatively arbitrary, "flat rule," *Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972), aimed at prohibiting all classes of transactions that fall within its scope regardless of the motives of the insider, the statute expressly provides that liability shall not attach to "any transaction or transactions which the Commission by rules and regulations may exempt." 15 U.S.C. § 78p(b) (1988). Pursuant to this provision, the SEC promulgated Rule 16a–10, which establishes that where the SEC does not require reporting under § 16(a), there can be no liability under § 16(b). 17 C.F.R. § 240.-16a–10 (1989) ("Any transaction which has been or shall be exempted by the Commission from the requirements of § 16(a) shall, insofar as it is otherwise subject to the provisions of § 16(b), be likewise exempted from § 16(b)."); *see also Reliance Elec. Co.,* 404 U.S. at 426, 92 S.Ct. at 601 (noting the effect of Rule 16a–10).

Although there is no mention of options in the text of § 16 of the Act, and although, prior to the SEC's rule changes in 1991, there was considerable controversy concerning whether options should qualify as "equity securities of [the] issuer" within the meaning of § 16(b), the SEC had issued a rule that established unambiguously that, for § 16(a) reporting purposes, options would be considered to confer rights of beneficial ownership as long as they were "presently exercisable." 17 C.F.R. § 240.16a–6 (1988). SEC Rule 16a–6(a), as it existed at all times relevant here, provided as follows:

> The granting, acquisition, or disposition of any *presently exercisable* put, call, option or other right or obligation to buy ... or sell securities ... shall be deemed to effect such a change in the beneficial ownership of the securities ... as to require the filing of a statement pursuant to section 16(a) of the Act reflecting such change in beneficial ownership.
>
> NOTES: 1. If any such right or obligation is not initially exercisable, the granting or acquisition thereof shall be reported in a statement filed for the month in which it became exercisable....

17 C.F.R. § 240.16a–6 (1989). Forms 3 and 4 promulgated by the SEC for filings by insiders under § 16(a) expressly stated: "Options exempt under Rule 16a–6 need not be reported." Together then, Rules 16a–10 and 16a–6(a) operated to exempt from § 16(b) liability options that were not "presently exercisable."

Roven claims that his options were not "presently exercisable" because there were two conditions precedent to exercise of the options. During the time that he held the Bear Stearns and Bache options, Roven held approximately 9.8% of Citadel's outstanding shares. Because each set of options referenced more than 0.2% of Citadel's outstanding shares, and because the options were exercisable only in their entirety, Roven would have come into possession of more than 10% of Citadel's shares had he exercised any of the options.

At the time of the transactions, the Article 8 restriction in Citadel's Certificate of Incorporation provided:

No person who is significantly engaged in an unrelated business activity shall be permitted, either directly or indirectly through an affiliate, to acquire control of the association.... [T]he term "control", in relationship to the percentage ownership of stock, shall mean the ownership of more than 10 percent of the outstanding voting securities of the association.

Second, by statute, insiders of institutions such as Citadel could not own, directly or indirectly, more than 10% of the common stock of the institution without first obtaining the approval of the Federal Home Loan Bank Board ("Bank Board"). *See* 12 U.S.C. §§ 1730a, 1730(q) (1988). Roven claims that these two restrictions acted as conditions precedent to his exercise of the nontransferable Bear Stearns and Bache options, rendering them not "presently exercisable" within the meaning of Rule 16a–6(a).

Citadel counters Roven's Rule 16a–6(a) exemption claim with two arguments. Citadel first emphasizes that nothing on the face of the options indicated that they were not presently exercisable. It argues that the SEC looks only to the express contractual terms of option contracts in determining whether an option is presently exercisable. Citadel's second argument is that the options directly conferred on Roven "beneficial ownership" of the underlying securities such that, regardless of the terms of Rule 16a–6(a) and any implied condition precedent to exercise, Roven had to report his acquisition of the options pursuant to the express terms of § 16(a). We consider Citadel's arguments in separate sections below.

### A. Were the Options Presently Exercisable?

We begin with the proposition, relied on by the district court, that all laws and regulations in force at the time an agreement is entered into become a part of that agreement, regardless of whether specific mention is made of those laws and regulations in the agreement. *See, e.g., Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 1164, 113 L.Ed.2d 95 (1991). Thus, even putting aside the Article 8 restriction,[3] it is clear that, as a matter of law, Roven's exercise of the nontransferable Bear Stearns and Bache options was conditioned on Roven's receipt of Bank Board approval. Citadel concedes that Bank Board approval can be thought of as an *implied* condition precedent to Roven's exercise of the options, but contends that Rule 16a–6(a) only exempts options that by their express terms are exercisable only after a certain date or upon a specified occurrence. Citadel, however, offers no supporting authority for such a distinction.[4]

■ To our knowledge, there are no cases or SEC publications addressing whether an implied condition precedent can render an option not "presently exercisable" within the meaning of Rule 16a–6(a), and the parties have not directed us to, nor have we discovered independently, any authoritative discussion of the term. By limiting the scope of the § 16(a) reporting requirement in the derivative securities area to "presently exercisable" options, however, the SEC clearly was operating on the understanding that § 16(b) liability does not attach to transactions in options *per se*. Instead, the evident premise is that only the *exercise* of an option can trigger § 16(b) liability, and that, accordingly, the only options of concern for reporting purposes are those which give the holder the right, at any time the holder desires, to take possession of the underlying securities. Viewed in this light, the proper question in

---

3. We do not rely on the Article 8 restriction because the district court made no express finding that Roven was "significantly engaged in an unrelated business activity," and, accordingly, we cannot determine whether Roven was covered by the restriction.

4. Citadel cites an SEC release to support its position. *See* Rules Applicable to Insider Reporting and Trading, Exchange Act Release 18114, 1981 SEC LEXIS 679 (Sept. 24, 1981). The release relied on by Citadel, however, is inappo-

site. The release merely states that where a corporation grants an option to an employee that, by its terms, is exercisable only upon retirement, it does not trigger § 16(a) reporting obligations. *Id.* at *58 (Question 48). This interpretation, of course, follows directly from the express language of Rule 16a6–(a), and has no bearing on whether an option not presently exercisable due to an *implied* condition precedent falls within the exemption.

determining whether an option is "presently exercisable" is not whether the restriction on exercise is present on the face of the option, but whether acquisition of the option gives the holder a "present" right to control the disposition of the underlying security.

■ Neither Roven nor anyone else could have exercised the Bear Stearns or Bache options during the time period in question. Roven himself legally could not exercise the options unless he first had received the necessary Bank Board approval or had sold off a sufficient quantity of his Citadel holdings that he could exercise the options without implicating the 10% ceiling. It is uncontested that Roven at all times held approximately 9.8% of Citadel's outstanding shares, and that he never obtained Bank Board approval to increase his holdings. Because the options were not transferable, moreover, Roven was prohibited from selling the options on the market to an individual not affected by the 10% ownership restriction. Accordingly, we hold that the Bear Stearns and Bache options were not "presently exercisable" within the meaning of Rule 16a–6(a).[5]

B. Beneficial Ownership—Exception to the Exception.

Citadel's second argument is that even if the options were not "presently exercisable," Roven still had an obligation under § 16(a) to report them. Citadel attempts to get around the Rule 16a–6(a) exemption by arguing that, because the option agreements gave Roven the opportunity to profit on the options as the market price of Citadel stock rose and fell, Roven effectively had "beneficial ownership" of Citadel securities, thus bringing the agreements directly within the purview of § 16(a). In support of this argument, Citadel emphasizes that courts have held that if the essential rights of ownership of the underlying stock are passed on through the

transaction, the purchaser will be deemed a "beneficial owner" of the stock regardless of the form of the transaction. As the Seventh Circuit put it, "[t]he commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock." *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

■ The "sham transaction" principle identified by Citadel is well-established, and we would not be constrained by Rule 16a–6(a) if we were convinced that Roven's acquisition of the options gave him "beneficial ownership" of the underlying Citadel stock within the meaning of § 16(a) of the Act. Under the SEC's regulatory framework as it existed at the time of the transactions, however, neither the SEC nor any court had held that the opportunity to profit on options *alone* would render ownership of options a form of "beneficial ownership" of the underlying securities. Significantly, Roven's agreements with Bear Stearns and Prudential Bache gave him neither the power to control the disposition of any Citadel securities nor any added leverage over Citadel management.

The three cases relied on by Citadel are all easily distinguished on this basis. In *Bershad*, the shares referenced in the option were endorsed in blank for transfer to the option holder and were placed in escrow with the seller's attorney, and the option holder received an irrevocable proxy to vote the shares. *Bershad*, 428 F.2d at 698. In addition, representatives of the option issuer resigned from the Board of Directors in order to allow nominees of the option holder to be placed on the board. *Id.* The options here had none of these characteristics, and were

---

5. Our holding has indirect support in the case law interpreting the meaning of "sale" for purposes of § 16(b) of the Act. *See, e.g., Colan v. Cutler–Hammer, Inc.*, 812 F.2d 357, 368 (7th Cir.) (describing a secret agreement guaranteeing an investor corporation the right to sell its shares at the time of a delayed merger as akin to a "formal option agreement," and holding that there was no "sale" at the time of the posited agreement where significant conditions prece-

dent to the merger had not yet been satisfied), *cert. denied*, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987); *Portnoy v. Revlon, Inc.*, 650 F.2d 895, 898 (7th Cir.1981) (holding that neither a letter of intent nor a merger agreement constituted a contract to sell shares within the meaning of § 16(b) where the agreement did not irrevocably bind the party to exchange its stock because there existed unfulfilled conditions precedent that could have blocked the merger).

not accompanied by any comparable side agreements. Similarly, in *Whittaker v. Whittaker Corp.*, 639 F.2d 516 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981), the insider's mother was the record owner of the securities, but the insider utilized his mother's assets as his own pursuant to a general power of attorney, giving him full control over the disposition of the shares. *Id.* at 525. Finally, in *Newmark v. RKO Gen., Inc.*, 425 F.2d 348 (2d Cir.), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), the court emphasized that the insider's control over the shares approached full ownership, noting that the options in question, part of a provisional merger agreement, "ensured that [the corporation] would be managed in accordance with [the optionee's] interests, and required a majority of [the corporation's] shares to be voted in support of a merger [the optionee] favored." *Id.* at 356.

Because Roven's acquisition of the options did not give him rights of ownership with respect to the underlying securities, we hold that the options did not confer beneficial ownership on Roven within the terms of § 16(a) of the Act.

### CONCLUSION

For the reasons described above, we conclude that the Bear Stearns and Bache options were not presently exercisable and did not otherwise confer on Roven beneficial ownership of Citadel securities within the meaning of § 16(a), as reasonably interpreted through then-existing SEC rules and regulations. Accordingly, we affirm the district court's grant of summary judgment in favor of Roven.

AFFIRMED.