**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS R. DREILING, a shareholder
of Infospace, Inc,
    *Plaintiff-Appellant,*

v.

AMERICA ONLINE INC; INFOSPACE,
INC., a Delaware corporation,
    *Defendants-Appellees.*

No. 08-35095

D.C. No.
CV-05-01339-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
May 7, 2009—Seattle, Washington

Filed August 19, 2009

Before: Kim McLane Wardlaw, Richard A. Paez and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

11363

**COUNSEL**

Richard E. Spoonemore & Stephen J. Sirianni, Seattle, Washington, and David M. Simmonds, Redmond, Washington, for the plaintiff-appellant.

Dane H. Butswinkas, R. Hackney Wiegmann, Marcie R. Ziegler & Amanda M. McDonald, Washington, DC, and Michael D. Hunsinger, Seattle, Washington, for the defendant-appellee.

## OPINION

N.R. SMITH, Circuit Judge:

Thomas R. Dreiling, a former InfoSpace, Inc. ("InfoSpace") shareholder, filed a derivative shareholder action against America Online, Inc. ("AOL"), seeking disgorgement of AOL's profits derived from the sale of its InfoSpace stock. Dreiling based his theory of liability on allegations that Naveen Jain, InfoSpace's CEO, formed a beneficial stock ownership group (in his personal capacity) with AOL, through two AOL executives (in their official capacities). Dreiling argues that AOL and Jain operated collectively to acquire, hold, and sell InfoSpace securities, making them beneficial owners of each other's stock. Dreiling argues that AOL was therefore an InfoSpace insider and its short-swing profits may be disgorged under Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b). Dreiling asks us to accept this novel theory of liability, reverse the district court, and thereby expand Section 16(b) beyond its previously-established boundaries. We decline to do so, and hold that the relationship between AOL and InfoSpace did not create a beneficial stock ownership situation such that AOL was an InfoSpace insider. Accordingly, we affirm the district court's grant of summary judgment to AOL.

## I. BACKGROUND

InfoSpace (an online telephone directory) contacted AOL (an internet service provider) in late 1997 or early 1998 in an effort to harness AOL's vast subscriber base to "drive more traffic to InfoSpace." In August 1998, AOL and InfoSpace reached an agreement (the "Agreement") to "promote and distribute an interactive [web]site" on AOL called the "AOL White Pages." The Agreement was scheduled to run for three years, with a one-year extension option.

AOL employees negotiated the Agreement on AOL's behalf. AOL also consulted its outside auditor, Ernst & Young, concerning accounting issues that arose during the negotiations. InfoSpace CEO Naveen Jain and General Counsel Ellen Alben represented InfoSpace in the negotiations. InfoSpace also consulted outside counsel and its outside auditor, Deloitte & Touche, throughout the negotiations.

AOL and InfoSpace entered the Agreement to combine AOL's membership with InfoSpace's directory assistance and resource library to "jointly operate the AOL White Pages." AOL would promote and distribute the AOL White Pages website to its members. In return, InfoSpace would produce and manage the AOL White Pages on an ongoing basis. Essentially, InfoSpace created a product and AOL attempted to sell that product to its members. InfoSpace agreed to compensate AOL in three ways: by (1) granting AOL conditional warrants to purchase up to 5% of InfoSpace stock, (2) making quarterly cash payments to AOL, and (3) sharing advertising revenue generated by the AOL Whitepages.

This compensation scheme employed the same kinds of incentives between product creator and seller as would a typical commission scheme. Under the Agreement, conditional warrants would vest quarterly with AOL, but only if the AOL White Pages processed twenty-five million searches (the "Target Number") in that quarter. If AOL failed to "sell" enough searches to reach the Target Number in any given quarter, the warrants would not vest and AOL would forfeit them. The Agreement also provided that InfoSpace would make cash payments to AOL each quarter the AOL White Pages achieved the Target Number. If AOL did not sell enough searches to reach the Target Number, AOL was required to "refund to InfoSpace the entire amount of the quarterly payment for such quarter (paid in advance by InfoSpace to AOL)," and AOL would forever forfeit that quarter's payment. The potential quarterly cash payments totaled $4 million in year one, $3 million in year two, $2 million in year

three, and $1 million in year four. The parties also shared in advertising revenue generated by the AOL Whitepages in such a manner that AOL had a strong incentive to drive as many members there as possible, so as to increase the website's desirability to potential advertising partners.

The Agreement further provided that AOL would pay Info-Space a $2 million penalty if AOL failed to generate a total of four hundred million searches over the life of the Agreement. Further, if AOL terminated the Agreement prematurely, AOL was required to pay InfoSpace an additional $500,000 and forfeit all cash payments. AOL and InfoSpace added this penalty provision late in the negotiations process, after Jain learned from his accounting team that InfoSpace could only expense the warrants at the then-current InfoSpace stock value (before InfoSpace's initial public securities offering ("IPO")) if InfoSpace received a "performance commitment" from AOL. The necessity of obtaining a "performance commitment" from AOL derived from Deloitte & Touche's advice regarding guidance issued by the Financial Accounting Standards Board ("FASB"). FASB standards, also known as generally accepted accounting principles ("GAAP"), are recognized as authoritative by the Securities and Exchange Commission ("SEC"). *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000) ("The SEC treats the FASB's standards as authoritative.")).

Under the FASB standards in effect in 1998, all transactions in which a non-employee provides goods or services in consideration "for issuance of equity instruments shall be accounted for based on the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable." *Accounting for Stock Based Compensation*, Statement of Fin. Accounting Standards No. 123, ¶ 8 (Fin. Accounting Standards Bd. 1995) (hereinafter "SFAS No. 123"). In order to accurately determine the fair value of the equity instruments issued (in this case, the war-

rants), InfoSpace could use either the "date at which a commitment for performance by [AOL] to earn the equity instruments is reached," or the "date at which [AOL's] performance is complete"—meaning each day AOL's warrants vested. *See Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services,* FASB Emerging Issues Task Force Issue No. 96-18, at 1-2 (Fin. Accounting Standards Bd. 1996). "A performance commitment is a commitment under which performance by [AOL] to earn the equity instruments is probable because of sufficiently large disincentives for nonperformance." *Id.* at 1 n.3. Forfeiture of the warrants "is not considered a sufficiently large disincentive" when it is the "sole remedy in the event of the [AOL's] nonperformance." *Id.* Deloitte & Touche therefore recommended that, in order to expense the warrants at the pre-IPO stock valuation, the Agreement should include a nonperformance disincentive of a penalty calculated at approximately 10% of the Agreement's value—$2 million. By agreeing to this provision, AOL would have committed to performing for SFAS No. 123 purposes, and the warrants could be valued and expensed pre-IPO.

Pre-IPO expensing was a critical deal component for InfoSpace, because the pre-IPO stock was valued at $3.33 per share. If required to value the warrants as AOL completed each quarterly performance, InfoSpace would have incurred nearly $116 million in warrant expenses from 1999-2000. By valuing the warrants as of August, 1998, and expensing the charge straight-line over the life of the Agreement, InfoSpace only reported $1.65 million in warrant expenses over that period. InfoSpace therefore considered post-IPO warrant expensing a dealbreaker, because this method of valuation would cost InfoSpace more than the anticipated revenue from the AOL deal. Jain communicated Deloitte & Touche's performance commitment proposal to his negotiation partners at AOL, who immediately rejected the idea of a penalty provision. At the time, the draft Agreement contemplated a $2.5

million payment per year from InfoSpace to AOL. Jain proposed changing that payment structure to a front-loaded structure much like the one AOL and InfoSpace settled upon in order to mitigate the effect of the penalty on AOL. AOL agreed to the proposal.

The Agreement took effect on August 24, 1998. In late 1999, Jain and AOL agreed in principle to suspend InfoSpace's revenue-sharing obligations under the Agreement. In early 2000, Jain learned that InfoSpace would likely not meet analyst expectations for its second quarter 2000 earnings. In order to bulk up InfoSpace's second-quarter balance sheet, Jain sought to formalize the agreement to terminate InfoSpace's obligations to share revenue with AOL, and recognize the transaction during the second quarter. Accordingly, InfoSpace prepared an amendment to the Agreement ("Amendment 1"), which "acknowledge[d] their agreement that InfoSpace is not obligated to share revenue with AOL until after the end of the third quarter 2000." Representatives from both companies signed Amendment 1, but it was not dated. As a result of this amendment, Jain informed his colleagues at InfoSpace that he had secured "over [$1] million in accrued expenses for AOL that we should be able to use in Q2." AOL's reasons for agreeing to Amendment 1 are unclear; when asked about its purpose at trial, AOL's signatory to Amendment 1, Eric Keller, invoked the Fifth Amendment and refused to answer.

Jain sold more than three million InfoSpace shares in 1999. AOL's warrants began vesting quarterly under the Agreement in February 1999, and AOL did not make any InfoSpace stock transactions in 1999. Jain sold over 1.5 million shares of InfoSpace stock on January 31, 2000. Jain sold another 1.5 million shares of InfoSpace between May 1, 2000 and June 13, 2000.

Two AOL executives, Lennert Leader and Ronald Peele, determined AOL's investment strategy with regard to Info-

Space stock. Neither Leader nor Peele knew of any agreement made by AOL to buy or sell stock in concert with Jain; both testified that they based AOL's investment decisions "on market and financial considerations." AOL executed its first Info-Space stock transaction on February 11, 2000, when it entered into a cashless collar transaction with Goldman Sachs. AOL and Goldman Sachs entered into three more cashless collar transactions: one on February 23, 2000 and two on May 10, 2000. Upon Peele's approval, AOL exercised tranches 2-6 of its InfoSpace warrants on March 3, 2000. AOL sold 247,476 shares of InfoSpace stock on March 15, 2000. Peele approved an exercise of tranche 7 of AOL's InfoSpace warrants on September 19, 2000. AOL did not sell any additional InfoSpace stock in 2000.

After InfoSpace's stock price plummeted, disgruntled shareholders sued Jain and InfoSpace for securities fraud, in an attempt to recover their losses. *See, e.g.*, *In re InfoSpace, Inc.*, 330 F. Supp. 2d 1203 (W.D. Wash. 2004).

Dreiling filed many actions against various parties associated with InfoSpace. *E.g.*, *Dreiling v. Jain, et al.*, Case No. C01-1528 (W.D. Wash.); *Dreiling v. Jain, et al.*, Case No. 01-2-08155-lSEA (King County (Washington) Superior Court); *Dreiling v. American Express Company*, No. C03-3740Z (W.D. Wash.). On August 1, 2005, Dreiling sued AOL for recovery of short-swing profits under Section 16(b) of the Exchange Act. Dreiling's Complaint against AOL alleges that AOL and Jain sought "(i) to secretly influence the corporate affairs of InfoSpace by creating artificial revenues and earnings; (ii) to hold their shares during the creation of artificial revenues and earnings; and (iii) to then sell their shares to unsuspecting investors at prices artificially inflated as a result of their concerted efforts."

The district court granted AOL's motion for summary judgment. For purposes of the motion, the district court assumed that AOL assisted Jain in accounting manipulation designed

to inflate InfoSpace's earnings, but held that Dreiling had not adduced any evidence to suggest that AOL was subject to short-swing profits rules. Accordingly, the court concluded that it "must grant AOL's motion for summary judgment." We review the district court's decision de novo, assessing whether, viewing the facts in the light most favorable to the nonmoving party, there are genuine issues of material fact and whether the district court correctly applied the substantive law. *See, e.g.*, *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004).

## II.  DISCUSSION

**[1]** "Congress enacted [Section] 16(b) as part of the Exchange Act to prevent corporate insiders from exploiting their access to 'information not generally available to others.' " *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946-47 (9th Cir. 2006) (quoting *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 592 (1973)). Section 16(b) prescribes that insiders must disgorge profits that derive from "short-swing" sales:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale . . . of any equity security of such issuer . . . within any period of less than six months . . . shall . . . be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security.

15 U.S.C. § 78p(b).

Congress decided upon disgorgement as a deterrence measure because it "recognized that short swing speculation by stockholders with advance, inside information would threaten

the goal of the Securities Exchange Act to 'insure the maintenance of fair and honest markets,' " *Dreiling*, 458 F.3d at 947 (quoting *Kern County*, 411 U.S. at 591). Section 16(b) therefore addresses a " 'class of transactions in which the possibility of abuse was believed to be intolerably great,' " *Dreiling*, 458 F.3d at 947 (quoting *Kern County*, 411 U.S. at 592 (internal quotation marks omitted)), by "impos[ing] a strict prophylactic rule with respect to insider, short-swing trading," *Dreiling*, 458 F.3d at 947 (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976)).

**[2]** Section 16(b) identifies three classes of "insiders" whose profits on short-swing trades are subject to disgorgement: directors, officers, and beneficial owners of more than 10% of any class of any equity security registered under U.S. securities law. *Dreiling*, 458 F.3d at 947; 15 U.S.C. § 78p(a)(1). Section 16(b) is "blunt" and unforgiving. *See id.* (citing *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 965 (9th Cir. 1994) ("[Section] 16(b) is a relatively arbitrary, 'flat rule' ")). It imposes strict liability on insiders, regardless of motive, and disgorges profits from all short-swing trades— even those not actually based on inside information. *Dreiling*, 458 F.3d at 947; *Kern*, 411 U.S. at 595 (noting that Section 16(b) requires disgorgement of profits "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information"). The Supreme Court has therefore narrowly construed Section 16(b)'s reach. *See, e.g.*, *Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (expressing the Supreme Court's "reluctan[ce] to exceed a literal, 'mechanical' application").

**[3]** AOL was neither an InfoSpace director nor officer. It therefore may only be required to disgorge its short-swing trading profits if it is an insider by virtue of being a beneficial owner of more than 10% of InfoSpace's shares.

**[4]** The Exchange Act does not define what makes a person a "beneficial owner" as the term is used in Section 16(b).

Accordingly, the courts developed a body of law to determine whether a person making short-swing trades is an insider for Section 16(b) purposes. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 122 (2d Cir. 2001) (citing *Mayer v. Chesapeake Ins. Co.*, 877 F.2d 1154, 1158-62 (2d Cir. 1989) (reviewing cases)). In 1991, however, the SEC substantially altered this body of case law by promulgating Rule 16a-1. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, Public Utility Holding Company Act Release No. 25254, Investment Company Act Release No. 17991, 56 Fed. Reg. 7242 (Feb. 21, 1991). Rule 16a-1 established that, for purposes of determining insider status as a 10% securities holder, "the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder." *Morales*, 249 F.3d at 122 (citing 17 C.F.R. § 240.16a-1(a)(1)).

**[5]** Congress enacted Section 13(d) as part of the Williams Act of 1968, passed in response to hostile corporate takeovers in the 1960s. *See id.* at 122-23; Act of July 29, 1968, Pub. L. No. 90-439, § 2, 82 Stat. 454. Section 13(d) was designed to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *Morales*, 249 F.3d at 122-23 (citing *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978)). To that end, Section 13(d) "encompasses not only the isolated shareholder who accumulates shares of a corporation's common stock, but also a group of shareholders who undertake the same activity as part of a collective effort." *Morales*, 249 F.3d at 123. Subsection (d)(3) states further that "[w]hen two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such . . . group shall be deemed a 'person' for the purposes of this subsection." 15 U.S.C. § 78m(d)(3). Congress appears to have enacted these

rules to prevent insiders from attempting to evade the disclosure requirement by pooling their interests:

> This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than . . . 10 percent of a class of securities at the time they agreed to act in concert . . . . This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement.

S. Rep. No. 90-550, at 8 (1967); H.R. Rep. No. 90-1711, at 8-9 (1968), as reprinted in 1968 U.S.C.C.A.N. 2811, 2818. *See also Morales*, 249 F.3d at 123.

**[6]** The SEC promulgated Rule 13d-5 to implement and clarify Section 13(d)(3). Rule 13d-5 defines beneficial ownership by a "group" as follows:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the [Exchange] Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d-5(b)(1). Thus, courts have concluded that the key inquiry in determining whether a group existed such that beneficial ownership could be imputed to certain shareholders is whether the parties "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of" a firm's securities. *See Morales*, 249 F.3d at 122-23 (citing 17 C.F.R. § 240.13d-5(b)(1))*; Corenco Corp. v. Schiavone & Sons, Inc.*,

488 F.2d 207, 217 (2d Cir. 1973) ("[A]bsent an agreement between them a 'group' would not exist.").

**[7]** The other appellate courts to conduct this inquiry have held that whether such an agreement exists is a question of fact. *See Morales*, 249 F.3d at 124 (2d Cir.); *Corenco Corp.*, 488 F.2d at 218 (2d Cir.); *Bath Indus., Inc. v. Blot*, 427 F.2d 97, 111 (7th Cir. 1970). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Morales*, 249 F.3d at 124 (citations omitted); *Savoy Indus.*, 587 F.2d at 1163. "In summary, [we must] sift through the record to determine whether" the district court erred by concluding that no such agreement existed between Jain and AOL. *See Savoy Indus.*, 587 F.2d at 1163.

Dreiling asserts that AOL and Jain acted in concert to further three "common objectives": (1) "to secretly influence the corporate affairs of InfoSpace by creating artificial revenues and earnings;" (2) "to hold their shares during the creation of such artificial revenues and earnings;" and (3) "to then sell their InfoSpace shares to unsuspecting investors" at artificially-inflated prices. Our analysis of the record leads us to conclude that Jain and AOL did not enter into a Rule 13d-5 agreement.

**[8]** As an initial matter, Section 16(b) does not provide any remedy for Dreiling's first assertion, that AOL and Jain acted "to secretly influence the corporate affairs of InfoSpace by creating artificial revenues and earnings." Rule 13d-5 makes clear that beneficial ownership is only imputed when "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). Viewing the facts in the light most favorable to Dreiling, as we must, at most AOL and Jain worked together to fraudulently inflate InfoSpace's revenues and earnings. This activity, however, is not within Section 16(b)'s ambit, because concerted efforts to engage in

accounting fraud do not form a beneficial ownership group for Section 13(d) purposes. *See* 17 C.F.R. § 240.13d-5(b)(1).

We note that Sections 16(b) and 13(d) were not devised to provide private litigants with another means of litigating securities fraud. Further, Section 10(b) of the Exchange Act authorizes private litigants to bring actions against issuers for securities fraud, but private litigants are barred from bringing actions against "secondary actors," such as AOL, for allegedly aiding and abetting securities fraud. *See generally Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761 (2008); *Central Bank, N.A. v. First Interstate Bank*, *N.A.*, 511 U.S. 164 (1994). Secondary actors are, however, subject to criminal penalties, *see, e.g.*, 15 U.S.C. § 78ff, and civil enforcement by the SEC, *see, e.g.*, § 78t(e), for aiding and abetting securities fraud. *See Stoneridge*, 128 S.Ct. at 773. The Supreme Court has concluded that the civil enforcement mechanism and possible "criminal penalties [provide secondary actors] a strong deterrent" to engaging in fraudulent conduct such that private litigation is not necessary. *Id*. Moreover, "some state securities laws permit state authorities to seek fines and restitution from aiders and abettors." *Id*. (citing e.g., Del. Code Ann., Tit. 6, § 7325 (2005)).

**[9]** Allowing Dreiling to bring what amounts to a barred Section 10(b) federal securities fraud claim under Section 16(b), without showing that a beneficial ownership situation existed under Section 13(d), would subvert Congress's intent in passing the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) ("PSLRA"). The PSLRA imposed heightened pleading requirements and a loss causation requirement upon "any private action" arising from the Exchange Act, in an attempt by Congress to reduce the number of frivolous securities lawsuits filed in federal court. *See Stoneridge Inv. Partners*, 128 S. Ct. at 773; 15 U.S.C. § 78u-4(b). *See also* S. Rep. No. 104-98, p. 4-5 (1995), reprinted in

1995 U.S.C.C.A.N. 679, 684 (indicating that, by enacting the PSLRA, Congress intended to reassert its authority to determine the extent of private rights of action). Because private actions do not extend to secondary actors under the typical Section 10(b) securities fraud claim, and, in light of Congress's desire to further limit private rights of action, Dreiling may not assert a securities fraud claim he could not bring under Section 10(b), simply by shoehorning the claim into Section 16(b).

[10] Though Dreiling did not explicitly allege an "acquire" claim in his Complaint, the Complaint arguably could be read to include an allegation that Jain and AOL entered into an agreement to acquire InfoSpace stock. We therefore address Dreiling's assertions under the "Acquire Theory." Dreiling's argument is premised on his contention that AOL and Jain entered into a beneficial ownership arrangement as early as August 12, 1998, when Jain proposed to AOL a method for subverting SFAS No. 123 and expensing the warrants based on InfoSpace's pre-IPO price. Dreiling argues that this accounting manipulation, combined with AOL's acquisition of InfoSpace securities through the vesting of the warrants at issue, support his theory that AOL and Jain were acting specifically to "allow AOL to acquire InfoSpace securities."

Dreiling's "Acquire Theory" fails for several reasons. To prevail on this theory, Dreiling must show that (a) an agreement existed between Jain and AOL, and (b) the purpose of the agreement was to acquire InfoSpace stock. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-5(b)(1). Dreiling cannot meet either requirement.

[11] The record demonstrates that AOL entered into its Agreement with InfoSpace in order to "jointly operate the AOL White Pages." The warrants provided to AOL as part of the deal were only part of AOL's total compensation for what amounted to its services as a sales/marketing agent for the new website. If AOL's main purpose was to acquire shares in

InfoSpace prior to its IPO, AOL could have done so through a myriad of less complicated transactions. That AOL was ready to walk away from the deal when Jain informed the firm of accounting complications bolsters this conclusion. Dreiling has not presented sufficient evidence that AOL and InfoSpace entered into any agreement for any reason other than to establish a joint venture to create a website and market it to AOL subscribers.

**[12]** Moreover, even if AOL entered the Agreement with InfoSpace with the purpose of acquiring InfoSpace stock, the Agreement was with *InfoSpace,* not Jain. AOL therefore cannot be said to have acted in a concerted effort with Jain to acquire stock. Dreiling cannot point to any authority for his assertion that an individual such as Jain becomes a member of a Section 13(d) group by participating in the negotiations that result in the formation of a business agreement between two companies, absent further evidence of concerted activity. Extending Section 13(d) to these limits eviscerates the Supreme Court's narrow interpretation of Section 16(b)'s reach. *See, e.g.*, *Gollust,* 501 U.S. at 122 (construing Section 16(b) narrowly).

**[13]** Dreiling points to AOL's agreement to enter into Amendment 1 in early 2000 as the basis for his "hold" and "sell" claims. These arguments also fail. First, Amendment 1 was an agreement between AOL and InfoSpace, not AOL and Jain. InfoSpace's Assistant General Counsel, Kurt Langkow, drafted Amendment 1, and numerous other employees participated in the process preceding its execution. Moreover, Amendment 1 did not have anything to do with "holding" or "selling" InfoSpace's stock. The Amendment may well have been an attempt by InfoSpace and AOL to inflate InfoSpace's balance sheets, but it is not the kind of stock-related agreement Section 13(d) contemplates. Finally, there is no evidence whatsoever of coordination between Jain and AOL regarding the stock transactions each party executed.

## III.  CONCLUSION

**[14]** After conducting an exhaustive review of this record, we conclude (as did the district court) that Dreiling "offers no probative evidence suggesting that there was ever an agreement between AOL and [Jain], in his personal capacity, to act together to acquire, hold, vote or dispose of InfoSpace stock." This fact is fatal to Dreiling's theory of Section 16(b) liability, because it means that AOL cannot be an "insider" subject to disgorgement of the profits derived from its InfoSpace stock trades. By bringing a Section 16(b) action against AOL, Dreiling attempts to shoehorn facts that at worst may show aiding and abetting accounting fraud—a theory for which Dreiling would have no recovery—into an ill-fitting theory he hopes to broaden. Given the narrow interpretation generally given Section 16(b) by Congress and all judicial precedent thus far, Section 16(b)'s intended purpose, and its blunt and unforgiving nature, we cannot conclude that it should apply to AOL under these facts. We therefore reject Dreiling's attempt to disguise an aiding and abetting of securities fraud action—a claim barred by statutory and Supreme Court precedent—as a short-swing profits case. We affirm the district court's decision to grant AOL summary judgment.

**AFFIRMED.**